Per Curiam: This case was referred to Trial Commissioner Boald A. Hogenson with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on October 22, 1970. Defendant filed exceptions to the commissioner’s opinion, findings of fact and recommended conclusions of law; plaintiff urged their adoption 'by the court; and, the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner’s opinion, findings of fact and recommended conclusions of law, as hereinafter set forth, it hereby 'adopts the same as the basis for its judgment in this case. Therefore, it is concluded that plaintiff is entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Buie 131 (c).
*105 OPINION OF COMMISSIONER
Hogenson, Commissioner:
Retired as an Army major, plaintiff by bis petition seeks judgment that be is entitled to recover from January 31,1963, the date of bis retirement for longevity, disability retired pay equal to not less than 70 percent of the pay of a major with over 20 years service for pay purposes, less the amount of retired pay which he has received by reason of years of service, with the amount of recovery to be determined in further proceedings pursuant to Rule 131 (c). In his briefs to the trial commissioner, plaintiff modified his request for relief by asserting that he is entitled to have his claimed disability retired pay computed on a combined rating of 60 percent from January 31, 1963 to January 31, 1965, with placement on the Temporary Disability Retirement List during that period, and thereafter computed on a permanent combined rating of 80 percent.
After a full review of the record and upon consideration of the legal authorities cited by the parties and their respective requested findings of fact, objections thereto, and briefs, it is my opinion based upon the following findings of fact, detailed and ultimate, and conclusions of law, that plaintiff is entitled to recover, with his disability retired pay computed on a combined rating of 40 percent for the period from January 31, 1963 to January 31, 1965, and thereafter on a combined rating of 80 percent, and that judgment should be entered accordingly, with further proceedings to be held for determination of the amount of recovery.
FINDINGS of Fact
1. Plaintiff, born February 12, 1923, is a citizen of the United States and a resident of San Antonio, Texas.
2. (a) Plaintiff served in the United States Army in an enlisted status from December 15, 1942 to September 13, 1950. Commissioned in the United States Army Reserve on September 14, 1950, he thereafter served on active duty continuously in a commissioned officer status until his retirement for longevity in the grade of major on January 31, 1963. His active duty service totaled 20 years, 1 month and *106 16 days. His Army serial number is 0 962 620. He was awarded the Silver Star, Purple Heart, Army Commendation Medal, and Master Parachutist Badge.
(b) He served in Europe from February 11, 1944 to July 22, 1946, and in Korea and Japan from August 14, 1951 to May 12, 1953.
(c) His basic branch was Infantry. His military specialties were Infantry Unit Commander, Order of Battle Specialist, Combat Intelligence Officer, and Military Personnel Officer. At the time of retirement he was serving as a military advisor (Infantry) to an Army reserve unit.
3. (a) On December 30, 1942, plaintiff was twice seen at the dispensary at Camp Chaffee, Arkansas. He advised that he had a sore throat and cough, and his condition was first diagnosed as pharyngitis and bronchitis, with his temperature recorded as 98.6 degrees. Upon his return to the dispensary, his temperature was 101.6 degrees, and his condition was then diagnosed as spinal meningitis, incurred in line of duty.
(b) Plaintiff was then hospitalized at the Station Hospital, Camp Chaffee, from December 30, 1942 to February 8, 1943. His condition, incurred in line of duty, was diagnosed: (1) Nasopharyngitis, acute, catarrhal, and (2) Meningitis, cerebrospinal (epidemic) acute. A spinal puncture was performed on January 9, 1943, for determination of type of meningitis, and the results were reported as positive for meningococci. Plaintiff was returned to duty on February 8, 1943.
4. (a) On July 4,1944, plaintiff was severely wounded on the right side of his face from a shrapnel shell explosion which occurred while he was engaged in combat at Normandy, France. He was hospitalized in France from July 11, 1944 to August 9, 1944. X-ray examination on July 15,1944, revealed fractures of the right zygoma and maxilla, with the right antrum encroached upon, but showed no foreign bodies in the eyes or skull. Plaintiff had a perforated ear drum, resulting from the shell concussion. It was recorded on July 16, 1944, that his right ear continued to discharge profusely, and on July 18, 1944, that the right antitragus was very painful and exuded pus. On July 24, 1944, a skin *107 graft was done to treat the condition resulting from severe lacerations on the right side of his face. On August 2, 1944, a small foreign body was removed from the helix of plaintiff’s right ear.
(b) His condition, incurred in line of duty, was then diagnosed: (1) Wound, lacerated, face, right side, severe, shrapnel, (2) Fracture, simple, zygoma, right, incomplete, and (3) Fracture, simple, maxilla, right incomplete.
5. After observation for an ear complaint at a clinic on November 27,1944, plaintiff was hospitalized in France from December 5 to December 8, 1944. His condition, incurred in line of duty, was diagnosed as otitis media, chronic, non-sup-purative, right, mild. He was again treated at the hospital on December 12, 1944, for salpingitis, eustachian, bilateral, mild, cause undetermined.
6. On August 9, 1945, plaintiff was treated for his complaint of pain deep in his right ear lasting 'for one week. The drum was bulging out. The diagnosis was otitis media, acute, right ear, moderate severity, some impairment of hearing, cause undetermined. Plaintiff was treated with penicillin for otitis media on September 13, 14 and 15, 1945. Pie was seen for his ear condition thereafter in 1945 on September 17 and October 15 and 16. On October 23,1945, a shrapnel piece was removed from his right ear.
7. On June 9, 1948, plaintiff was physically examined at Fort Bragg, North Carolina, for qualification for appointment in the Officers Reserve Corps. The recorded medical history included the statements “No Physical Complaints” and “No illnesses, injuries, operations or hospitalizations IMS.” A hernia scar, a 2y2 inch scar right cheek, and tattoos were noted, but they were considered to be not significant, not disabling. The three member examining board recommended plaintiff’s appointment, and on July 19, 1948, plaintiff was by the Office of the Surgeon, Governors Island, New York, found physically qualified for appointment in the Officers Reserve Corps.
8. On November 10, 1948, plaintiff was given a physical examination at Fort Bragg, North Carolina, and found “Physically Qualified for Further Military Service.” Under Statement and Medical History of Examinee, plaintiff an *108 swered “No” to the question: At the present time do you have any wound, injury, or disease which is disabling? The report of physical examination further notes that plaintiff stated “No illnesses, injuries, operations or hospitalizations IMS. No Physical Complaints.”
9. On August 8, 1950, plaintiff underwent a physical examination for extended active duty. In the attendant Report of Medical History, plaintiff stated that he had spinal meningitis in January 1943 while 'at Gamp Chaffee, Arkansas; that he had received a shrapnel wound in July 1944 in France; that he had been in a jeep accident in April 1946 in Germany; that he had been in a motorcycle accident in July 1947 at Fort Bragg, North Carolina; that he had a hernia operation at 20 years of age; and that he did not have any present physical or mental complaint.
Plaintiff was found qualified for “extended active duty” by the three medical examiners, and upon review of the medical examination report by the Medical Section, Headquarters Third Army, Fort McPherson, Georgia, plaintiff was found physically qualified 'for general military service and parachute duty.
10. On September 13, 1950, plaintiff was examined for separation from his enlisted status and found qualified for general 'military service.
11. (a) On February 26, 1953, while stationed in Japan, plaintiff sustained a severe fracture of the upper shaft of his right femur in an authorized parachute jump. He was hospitalized in Japan from February 27,1953 to May 8,1953, when he was transferred by airplane for hospitalization in the continental United States. His diagnosis in Japan was fracture, simple, comminuted, right femur, no major nerve or artery involved.
(b) Plaintiff was hospitalized at Letterman Army Hospital, San Francisco, California, from May 14, 1953 to November 26, 1954, when he was discharged to “Duty General Service.”
(c) The course of treatments, tests, diagnoses, operations and plaintiff’s condition to October 25, 1954, were described in the narrative summary contained in the Letterman Army Hospital’s record of plaintiff’s case, as follows:
*109 This 30 year old white male suffered a simple com-minuted fracture of the right femur in a parachute jump at Oita, Japan on 26 February 1953. He was treated with skeletal traction for approximately 9 weeks and then evacuated to ZI in a hip spica. He arrived at Letterman Army Hospital on 13 May 1953 at which time the cast was removed and traction with K-wire reapplied.
Past History: This is non-contributory except for spinal meningitis in 1943 with 42 days hospitalization with apparently no residuals.
Operations: Herniorrhaphy in 1943.
Skin graft to wound below right eye, July, 1944.
Physical examination: When examined on admission, patient appeared to be a well developed, well nourished, white, male in no distress. His right leg was in traction when seen. The rest of the physical examination was negative except for the following points: The ears reveal a perforated right drum due to old facial injury; abdomen revealed left inguinal hernia repair scar. Extremities review indicate the right leg in traction.
Course In Hospital: Initial laboratory work was essentially negative except for the x-ray which revealed a simple comminuted fracture of the proximal femur shaft. The general position and alignment were satisfactory. He was continued in skeletal traction with 12 lbs. of weight. Because the pin through the tibia prevented activity or motion while in skeletal traction, skin traction was applied. The patient continued to do well and the fracture was clinically solid by the end of May. He was placed on active exercises in bed with leg strengthening exercises to the injured extremity. On 1 June 1953 he could lift his leg free of the extension apparatus without symptoms. On 6 June 1953 after being out of traction for several days, there appeared to be an inch of over-riding of fragments. There was clinical evidence of a shortened right lower extremity. Under local procaine anesthetic, he was again placed in skeletal traction and weights increased up to 20 lbs. The deformity was considerably improved by this procedure and the weights were gradually reduced. His muscle exercise program continued and he was developing good strength in the quadriceps. He continued to do well as far as the fracture was concerned but it was noted that he had limitation of motion of the right knee which was slow to improve. He was continued in skin traction until 8 September 1953 when he was placed in a walking hip *110 spica with a %" lift on the right shoe. X-rays taken in the hip spica reveal some slight angulation of the fracture site. It was felt that even though this fracture was slow to heal that it would become solid without operative interference. He was maintained on a walking spica for 6 weeks. New x-rays reviewed 30 October 1953. revealed progress in bone healing but it was felt that a reinforcing bone graft of the fracture site was necessary. On 2 November 53 the patient was taken to surgery where an iliac bone graft was done and bone chips applied to the site of the non-union. He did well following the operation. About 20 November 1953 both wounds were completely healed and the patient was maintained in 10 lbs. of skin traction with active exercises of the right hip and knee being carried out. In an attempt to improve the motion of the right knee, l[1]/^ c.c.’s of hydrocortone were injected into the right knee joint. There was little or no improvement following this. Patient continued to improve slowly. He was placed in a hip spica over the holidays and did well. On 12 January 1954 he was re-x-rayed and it was evident that the bone was healing slowly. He was again placed in a hip spica in order to stimulate the healing process. He was continued in and out of plaster until 10 June 1954, when he was placed on bed rest and started on active knee and hip exercises with 5 lbs. of skin traction to the right lower extremity. About 10 July 1954, the patient was ambulatory and was going to P.T. and O.T. He continued to gain in motion of the hip and his ability to walk. Range of motion in the knee was improving slightly. On 24 September 1954, the patient was measured for orthopedic shoes which were to be built in Boston. On 5 October 1954 it was felt that he had received maximum benefits as far as physical therapy was concerned and as patient was now fully ambulatory, he was returned to duty on 25 October 1954 with a permanent profile of L-3; to be excused from marching, drilling, prolonged standing and weight bearing. On discharge, there was approximately 1" shortening of the right lower extremity. The final x-rays revealed an irregularity at the site of the fracture with some sclerotic changes. There was no evidence of bone destruction.

Diagnosis:

23521-416 Fracture, closed, femur, right. A.I. in authorized parachute jump, 26 February, 1953, at Oita, Japan. Condition: Healed
235A004 Deformity of femur, right, due to trauma manifested by shortening. Condition: Unchanged.
LOD: Yes

*111
Operations:

22x1-17 1. Excision of bone for graft from right ilium. Performed: 2 Nov 53. Anesthesia: General — sod. pent.
235-516 2. Bone graft to right femur. Performed : 2 Nov 53. Anesthesia: General — sod. pent.
23717-330 3. Insertion of Kirschner wire through tibial tubercule, right, for skeletal traction. Performed : 19 May 54. Anesthesia: Local
(d) Other pertinent entries in the Letterman Army Hospital record, not expressly mentioned in the above-quoted narrative summary, were:
On August 14,1953, the range of motion of the right knee was recorded as about 180-160 degrees, and resistive exercises were prescribed.
On September 25, 1953, it was noted that present X-rays revealed slight angulation of the fracture site, and that the fracture had been extremely slow in uniting.
On December 4, 1953, it was recorded that plaintiff was discouraged over limited range of motion of the right knee, and that it was explained to plaintiff that such limitation was due to prolonged immobilization, with some chance that the range of motion would be improved.
A consultation report, dated January 11, 1954, stated that plaintiff’s knee motion was limited to about 10 degrees from complete extension, and that all movements of the hip and knee were markedly weak.
A radiograph report, dated July 30,1954, stated that there was marked irregularity at the fracture site, with presence of considerable sclerotic changes, but no evidence of seques-tra or bone destruction.
A radiograph report, dated September 29, 1954, stated that the union of the fracture appeared to be rather firm but not complete.
(e) Following his hospitalization for fracture of the right femur, plaintiff continued to have a stiff and painful right knee with limitation of motion, pain in the right thigh, a two-inch shortening of the right lower extremity, inability to squat, walk or stand for prolonged periods of time, difficulty in going up and down stairs, inability to crawl, march, run, or jump.
*112 12. On. October 26,19,54, an Army physical profile rating[1] of plaintiff’s physical condition was furnished plaintiff’s commanding officer. Plaintiff’s prior physical profile was reported as P-1, U-l, L-l, H-l, E-l, and S-l. His revised profile was P-1, U-l, L-3, H-l, E-l, and S-l. It was stated that plaintiff was considered unfit to return to full duty, that shortening of plaintiff’s right leg required special consideration in his assignment, and that plaintiff was permanently unfit for marching, drilling, prolonged weight bearing and standing.
13. On October 24,1957, an outpatient medical record concerning plaintiff was prepared at the Army dispensary at Fort Buchanan, Puerto Eico, and it was stated therein by an Army medical officer that it was medically undesirable for plaintiff to use his legs to excess, either in prolonged walking, marching or standing; that it was advisable that due consideration be given in this regard whenever assigning him duties; and that the profile letter in plaintiff’s possession should be seen.
14. (a) On June 19, 19.61, while serving as the Unit Ad-visor to a Eeserve component at Ponca City, Oklahoma, plaintiff experienced the onset of a sudden severe headache following engagement in some heavy physical exertion in conjunction with his duties. Because of the persistence of the headache, plaintiff was an outpatient at the Army hospital, Fort Sill, Oklahoma, commencing June 29, 1961, and was hospitalized there from July 3 to July 12, 1961, when he was released for transfer to the Brooke General Hospital, Fort Sam Houston, Texas.
(b) In addition to statements otherwise set forth in the narrative summary quoted below, the Fort Sill hospital record of the admission examination of plaintiff on July 3, *113 1961, stated that plaintiff had experienced severe generalized headaches, with sudden onset, most intense at the vertex of the scalp on June 19, 1961; that he had taken numerous pills prescribed by several physicians, without sustained relief of his symptoms; and that the initial impression of his condition was post-spinal headache and cerebral aneurysm with subarachnoid hemorrhage.
(c) Both as an outpatient and a patient, plaintiff’s examinations, treatments, tests and diagnosis at the Fort Sill Army hospital were described in the narrative summary contained in that hospital’s clinical record of plaintiff’s case, as follows:
On 19 Jmi 61 this 38 year old white male had the sudden onset of a very severe headache while doing some heavy lifting; it felt as if his head were going to explode. He was mildly nauseated initially but 'had no vomiting and no loss of consciousness and no visual disturbances and no localizing neurological signs at any time. Prior to admission, on 3 Jul 61, he had been examined by at least three physicians and no significant abnormalities were found on neurological examination to his knowledge. He was treated symptomatically. On 29 Jun 61 he was seen in the Internal Medicine Department. Initially, the headache had been steady in character, but prior to his examination on 29 Jun for a few days the headache was described as being intermittently throbbing. He had no lateralization of the headache. He had no similar headaches in the past except for a headache when he had meningitis in 1942. On 29 Jun, on neurological examination, there was no gross sensory deficit. The gait, stance, and mentation were okay. The deep tendon reflexes were equal except for the left knee jerk, which was 3+, and the right knee jerk, which was 2+ (the patient had had rather extensive surgery on the right thigh for a comminuted fracture of the femur and this probably accounted for the difference in the knee jerks). The cremasteric reflexes were intact. There was a bilateral plantar flexor response. There was no intracranial bruit. On 29 Jun a spinal puncture was performed. The initial pressure was 156 mm CFS and the final pressure was 140 mm CFS. Unfortunately, the tap was slightly traumatic and the fluid in two tubes, therefore, was slightly turbid; but on further study there was an equal distribution of red blood cells throughout all tubes. The supernatant was colorless and crystal clear. There were 1100 fresh red *114 blood cells per cu mm and none of these were crenated. No white blood cells were seen in the cerebral spinal fluid. The cerebral spinal fluid total protein was 46 mgm %; the sugar was 66 mgm %. No organisms were seen on gram stain of the CFS. The culture of the CFS showed no growth. The skull films were normal. On 30 Jun the patient was seen again as an out-patient. He had had no headache during the night. He had had a mild headache on the morning of 30 Jun. On 2 Jul he developed a rather severe posterior cervical pain with radiation to the occipital area. The pain occurred on standing and was relieved by lying down. The pain persisted to the time of admission. The neck felt tight. The vision was good. There were no other symptoms.
Past History and Social History: The patient has 18% years active duty. At the present time he is a Unit Advisor for reserve component. He had foreign service in Europe from 1943-46 and in Korea from 1951-53. He smokes 40 cigarettes daily. He was a relatively heavy drinker until Sep 60. He now drinks about one-half bottle of gin weekly. He had mumps, measles, chickenpox in childhood. In 1943 he had meningitis. He had a left inguinal herniorrhaphy in 1943. In 1944 he had a shrapnel injury to the right side of the face; he has had chronic otitis media of the right ear since then. In 1952 he had fulguration of an urethral tumor. In 1953 he sustained a comminuted fracture of the right femur in a parachute jump; treatment required a bone graft from the right ilium and the right leg is about two inches shorter than the left leg. In 1960, because of hematuria, the patient had cystoscopy and was found to have a minute amount of hemorrhage in the bladder neck, a prominent vera mentanum, and some inflammation about the interurethral orifices.
Family History: The patient’s mother died at 60 years of age from a stroke. His father died at 70 years of age from old age. One brother died from a ruptured appendix. The patient has eleven other siblings living and well.
Review of Systems: Except for a morning cigarette cough, the review of systems was unremarkable.
Physical Examination: The patient was well-developed and well-nourished and appeared to be in no distress. Examination of the head and neck was unremarkable.. The pupils were round and equal and reacted readily to light. The extra-ocular movements were normal. There was no nystagmus. On funduscopic examination the optic discs appeared physiologic and the ves- *115 seis and retinae were normal. The eardrums were not injected. The lungs were resonant and clear. The heart had regular rhythm, normal heart sounds and no murmurs. The femoral and dorsalis pedis pulses were of normal intensity. The abdomen was soft and flat and not tender and the liver and spleen were not palpable and no abnormal abdominal masses were palpable. There was no inguinal hernia. The external genitalia were normal. No abnormal rectal masses were palpable. The prostate gland was small, smooth and firm. The right leg was shortened by a comminuted fracture of the right femur which required a bone graft. The deep tendon reflexes were equal bilaterally except for knee jerk on the left being 3+ and the knee jerk on the right being 2+. The ankle jerks were 2+ bilaterally. There was no Babinski. There was no apparent cranial nerve paresis. There was no cervical lymphadenopathy. The thyroid gland was not enlarged.
Laboratory Studies: The hemoglobin was 17.9 gm •% and the hematocrit was 50 vol %. The white blood count was 8,000 with 65% neutrophiles, 34% lymphocytes and 1% eosinophiles. The sea rate was 6 mm/hr. The urinalysis had a specific gravity of 1.020 and was negative for albumin and sugar. The microscopic examination of the urine revealed 8-10 WBC’s per HPF. The serology was non-reactive.
Hospital Course: On admission to the hospital the patient had a headache whenever he was sitting or standing and the headache was relieved by lying down. On a program of limited activity the headache gradually subsided. On 7 Jul 61 the headache was almost completely gone and a repeat spinal puncture was performed. The spinal tap was considered definitely non-traumatic. The initial pressure was 128 mm CFS. The CFS was crystal clear. On microscopic examination of the CFS 126 red blood cells per cu mm were found and about 57% of these were crenated. Also, there were 5 WBC’s per cu mm; these were all lymphs. The cerebral spinal fluid total protein was 37 mgm %. Following this spinal tap the patient was kept at bedrest and during the next 2-3 days developed no significant headache. Because of the nature of the onset of Ms headache, the severity of the headache, the presence of red blood cells in the cerebral spinal fluid on two occasions, and the presence of 57 % crenated red blood cells on the second specimen which was examined immediately after the spinal puncture, it is suspected that the patient could well have an intracranial aneurysm. It is recommended that the *116 patient be transferred to a named general hospital for carotid arteriograms.
Diagnosis: 5022 Aneurysm, cerebral vessel (suspected) . LOD yes
15. (a) Plaintiff was hospitalized at Brooke General Hospital, Fort Sam Houston, Texas, from July 13 to July 19, 1961.
(b) The Narrative Summary of plaintiff’s clinical record in that hospital was as follows:
This 38 year old white male noted the sudden onset of severe generalized headache on 19 June 1961 after the completion of heavy work for a period of approximately 30 minutes. There were no prodromal systems of aura and he did not lose consciousness. There was no subsequent nausea or vomiting. He was seen by three doctors who found no abnormalities. He remained afebrile and states that he had no similar complaints except during a bout of meningitis in 1942. He was admitted to the Fort Sill Army Hospital approximately 10 days after the onset of his headaches when his headaches were diminishing and after a traumatic spinal tap BBCs without crenation were noted in his cerebrospinal fluid. His headaches diminished almost completely but two days later he noted recurrence of a posterior headache with stiffness in his neck and a repeat spinal tap revealed a few crenated BBCs and a clear fluid on 7 July. Pie has continued to have occasional headache which is relieved by aspirin and was transferred to this hospital for further evaluation.
Past History a/nd Review of Systems: The patient drinks moderately 'but gives a past history of drinking heavily. He has 18y2 years of service. Pie is a Captain in the Armored Infantry. Plis mother died of CVA at age 60 and father died at age of 70 years of old age. He has had the usual childhood diseases. He has had a urethral fulguration for a “tumor”. He had a fractured femur in 1953 and herniorrhaphy in 1943. He denies drug allergies. The review of systems is negative.
Physical Examination: On admission this is a well developed, well nourished middle aged white male in no distress. He as alert, cooperative and well oriented in all spheres. The entire physical examination is within normal limits.
Laboratory pata: Admission CBC, urinalysis, and serology are within normal limits.
X-Ray Data: #221920 — The chest x-ray was normal.
*117 Course in Hospital: During a period of observation the patient required no medication for headache. He did not have a stiff neck or any localizing neurological abnormalities. An BEG performed on the day prior to discharge was normal. It was felt that he had no indications for further diagnostic procedures and he was discharged to duty without change in profile on 19 July 1961.

Diagnosis :

1. Not concurred in.
2. 91x-yx5y Observation, surgical, for sub-arachnoid hemorrhage.
Operations: None.
Addendum: The character of the patient’s initial headache was not that of subarachnoid hemorrhage since initially he developed no stiffness of the neck, low back pain or sciatica. The etiology of the initial headache is certainly unclear but is considered to be functional rather than organic. The second headache which occurred some two days following his lumbar puncture, was characteristically a post-spinal headache (cerebrospinal fluid hypotension) since it was suboocipital associated with some stiffness of the neck 'and aggravated by the erect position relieved by lying down. On the basis off the character of the patient’s headaches and the fact that the spinal fluid findings certainly are explainable from a traumatic tap rather than spontaneous hemorrhage, angiographic studies were not considered indicated. The first lumbar puncture was done ten days following the onset of his headache and it is felt that the supematent fluid would have been xanthochromic had the patient developed a subarachnoid hemorrhage ten days previously.
(c) The Addendum in the foregoing Narrative Summary was prepared by the hospital’s Chief, Neurosurgery, with the rest of such summary prepared by the Army physician assigned to plaintiff’s case.
(d) Other pertinent entries in the Brooke General Hospital record, not expressly mentioned in the foregoing narrative summary, were:
Plaintiff stated at the time of admission that his sudden onset of headache on June 19, 1961, felt like something exploded in Ms head; that he was then nauseated without vomiting; that he had no history of head trauma since 1955 when an accident caused scalp laceration without sequelae; and that Ms headache was not relieved by “ASA” or darvon.
*118 In Doctor’s Progress Notes, dated July 12, 1961, it was recorded that plaintiff stated that it “was mental effort” to drive his car two blocks home from the place where his sudden headache occurred on June 19, 1961. This same note recited that plaintiff had never had a stiff neck.
The report of physical examination of plaintiff, conducted July 13, 1961, noted: Neck (?) stiff; ‘and recorded the impression: Headache due to (1) Subarachnoid hemorrhage secondary to aneurysm, and (2) Migraine headache.
The report of an electroencephalogram (EEG) examination of plaintiff, performed July 18, 1961, indicated abnormality “due to suspicious left frontal slow waves and hyperventilation effect.”
16. By letter dated July 13, 1961, The Adjutant General, United States Army, advised plaintiff concerning retirement in pertinent part as follows:
In accordance with the Army’s maximum service policy announced in Section Y, All 135-173,1 must inform you of your release from active duty on 31 January 1963. I hope that this early notification will assist you in planning your future.
As you will be eligible by 31 December 1962 for retirement under All 635-130, you may apply for voluntary retirement to be effective not later than 31 January 1963. In this connection, your attention is invited to AR 635-130. If you decide to retire, your application must be submitted so as to arrive in Headquarters, Department of the Army, not later than 60 days prior to desired retirement date.
17. On April 26,1962, in connection with an annual physical examination, plaintiff was given an orthopedic examination, requested by reason of “ankylosis, right knee with some atrophy of right leg.” The report of orthopedic examination was as follows:
_ This 39 year old officer sustained a fracture of the right femur in February 1952 in a parachute drop in Japan. He was hospitalized until December 1954 and then returned to duty. Following that fracture, he has had a stiff right knee and a pain in the right thigh as well as shortening o'f the right lower extremity. His knee motion -has gradually improved somewhat.
At this time, examination reveals that the right lower extremity is 5 cm short. The right knee has a range of *119 motion, from full extension and flexes 90 degrees. There is no significant atrophy of the muscles of the right lower extremity. The patient wears a special orthopedic shoe with an inside buildup at the heel. X-ray of the right knee reveals some demineralization but no other significant abnormality. No x-ray of the right femur was taken on this visit.
Diagnosis: Malunion of the right femur with moderate knee disability and 5 cm of shortening.
Recommendations: This individual should have a permanent L-3 profile. He requires a built-up shoe and is unfit 'for running, jumping, crawling, long walking (Imile).
18. Under date of April 30, 1962, an Army medical officer for the Commanding Officer of the Army hospital at Fort Sill, Oklahoma, prepared for plaintiff’s commanding officer at Fort Chaffee, Arkansas, an Army physical profile record of plaintiff. It was therein stated that plaintiff was qualified for retention on active duty as evidenced by a medical examination and a review of his health record as of April 26,1962. The present physical profile rating was stated P-1, U-l, L-3, H-l, E-l, S-l. Plaintiff’s defect noted was Malunion of fracture, right femur. It was stated under the item of Major Assignment, Geographical and Climatic Limitations: No running, jumping, crawling or long walking (over 1 mile).
19. In October 1962 plaintiff submitted a written request through proper channel to the general staff officer in charge of personnel of the 19th United States Army Corps for the purpose of having his physical status evaluated by a Physical Evaluation Board (PEB). In response to this request plaintiff was advised to submit an application for temporary duty at Fort Sam Houston, Texas. An application made by plaintiff for this purpose was approved. Plaintiff’s retirement physical examination would otherwise have been conducted at Fort Sill, Oklahoma, the nearest Army medical facility to his duty station at Ponca City, Oklahoma.
20. (a) Plaintiff arrived at Brooke General Hospital, Fort Sam Houston, Texas, about November 1, 1962. No advance arrangements had been made, and plaintiff had to wait for about 15 days before he could be placed on the schedule of examinations at Brooke General Hospital.
*120 (b) On November 15 and 16, 1962, plaintiff underwent physical examination for purposes of retirement.
(c) In the report of medical history, plaintiff stated his present health in his own words:
Basically my health is good except for my right ear and right leg. Because of the shortening of my right leg, I have severe back aches when I stand or walk for extended periods.
(d) In his statement of medical history, plaintiff advised that he had had a left inguinal hernia operation in 1943; a skin graft to his right cheek incident to shrapnel wound in 1944; chronic otitis media of right ear since 1944; ful-guration of urethral tumor in 1952; bone graft from right ilium to right femur in 1953; and a cystoscopy in 1958. He also advised that he had had meningitis in 1942-1943.
(e) Plaintiff also advised that he had experienced swollen or painful joints, frequent or severe headaches, eye trouble, ear trouble, running ears, cramps in legs, frequent indigestion, adverse reaction to medicine, frequent or painful urination, bone deformity, lameness, knee difficulty, frequent trouble sleeping, and excessive worry.
(f) The examining physician’s summary and comments on plaintiff’s complaints were:
Swollen or painful joints as a result of fracture of right femur in 1952.
Cramps in legs are a result of training.
Headaches were severe beginning 13 July ’61 and he was hospitalized for possible subarachnoid hemorrhage. These headaches are now no more than normal.
Has a history of chronic otitis since July 1944.
Indigestion-probably the result of or secondary to tension.
Patient is allergic to Chloromycetin.
Urethral tumor in 1952 removed. Plemia repair 1943. No recurrence.
Hemorrhoids have developed recently.
(g) In connection with inquiry on the report of medical history as to whether plaintiff intended to apply for pension or compensation for existing disability, plaintiff responded in the affirmative and stated: I intend to apply for disability based on this final physical.
(h) Plaintiff believed that following his receipt of the *121 results of bis physical examination, be would be placed before a Physical Evaluation Board, but such proceedings were never held.
(i) In the report of medical examination, items of plaintiff’s physical condition checked as abnormal were: 22. Ears — general; 32. Anus and rectum; 34. G-U system; 37. Lower Extremities; and 39. Identifying body marks, scars, tattoos. On such items of abnormality, the descriptive notes recorded were as follows:
#22. Scarring of right TM. Chronic Otitis right ear.
#32. Small external hemorrhoids.
#34. Occasional burning on micturition.
#37. Limited flexion of right knee. Eight lower extremity is shorter than the left. Bone graft taken from right iliac crest area.
#39. Scar right cheek, right iliac area, and thigh.
(j) The following additional notes were set forth in the report of medical examination:
Patient has difficulty with vision of the left eye on occasion. He has been seen by a civilian ophthalmologist and told that he possibly had a “burned” ? lesion of the eye.
(See attached Orthopedic Clinic Consultation, ENT Consultation)
(k) Under Summary of Defects and Diagnoses, the following entries were made in the report of medical examination:
Chronic purulent otitis media and mild conductive hearing loss secondary to this.
H-3 profile. AMA x80-100, VAB 6200-A.
Chondromalacia, right knee. Fit.
Mixed astigmatism, corrected.
(l) The physical profile rating of plaintiff was recorded; P-1, U-l, L-2, H-3, E-l, S-l.
(m) No electroencephalogram or other neurological examination was conducted.
(n) It was stated that plaintiff was qualified for retirement. No statement was made that plaintiff was qualified for general military service.
(o) On November 15, 1962, the examining physician requested an orthopedic consultation report concerning plaintiff for: Swollen or painful joints as a result of fracture of right femur in 1952.
*122 21. The requested orthopedic consultation report was rendered by Captain Louis Losser on November 15, 1962, and contained the following consultation report concerning plaintiff:
39-year old, white male, Major, with 20 years active duty in Infantry, sustained subtrochanteric and upper % femural closed fracture, right femur, in parachute jump February 52, in Japan. Treated in skeletal traction 8 months and then had a bone graft from right ilium to the fracture site following which he was maintained in skeletal traction another ten months, following which he was returned to duty. Since that time he has experienced pain in both the right hip and right knee on prolonged standing and has been unable to do any marching. He has held down a desk job since time of discharge from the hospital. He has noted no heat, redness of these joints however. There is good strength in the right knee with no ligamentous laxity, no warmth, tenderness or effusion, though there is subpatellar crepitation. Bange of motion at the knee is 0 degrees extension with 90 degrees flexion. The hip reveals a well healed surgical scar over the right iliac crest which is somewhat depressed except for palpable ectopic bone deposits. There is also a well healed surgical soar over the lateral aspect of the right thigh and no tenderness in this soar or over the old fracture site. Bange of motion at the hip is 130 degrees flexion and 15 degrees extension. No limitation of abduction or adduction. There is no warmth, swelling or tenderness over the hip. The patient moves well. Internal rotation of the right hip is 45 degrees, external rotation 15 degrees, and there is 1%" discrepancy in leg length on the right, measuring from the umbilicus to the medial malleolus.
X-rays of the pelvis, right hip and right femur on 15 Nov 62 reveal the ectopic bony projections of the old donor site of the ilium and the fracture of the right femur is well healed. X-ray 221920. X-rays of the right knee taken July 1961 reveal demineralization of the bones about the joint with some evidence of joint narrowing. There is also evidence of old chondromalacia. Films of right knee ESS unchanged today from Jul 61.
Impression: Chondromalacia, right knee. Fit. AT?. JO-501, Chap. 3. Becommend new films of the right knee.
22. On November 21, 1962, plaintiff submitted an application through his Army command to The Adjutant General for voluntary retirement on January 31, 1963, and stated therein in pertinent parts as follows:
*123 1. Under the provisions of law cited in paragraph 6, AT?, 635-130, it is requested that I be retired on 31 January 1963, or, as soon as practicable thereafter, and that I be transferred to the Betired Reserve immediately upon retirement. On requested retirement date I will have completed over 20 years of active Federal service.
* * * ❖ ❖
4. A medical examination report including electrocardiogram and serology report (prepared in accordance with para 23c, AR 635-130) will be forwarded upon receipt of same from physical examining facility at Fort Sam Houston, Texas. I further understand that a delay in accomplishing a medical examination may result in my retirement without a full and fair consideration ox my medical condition.
Plaintiff did not know the results of the retirement physical examination at the time he filed the application for voluntary retirement.
23. On December 5, 1962, plaintiff received a copy of his retirement physical examination report of November 15, 1962, and forwarded the same to The Adjutant General. During the pendency of his application for retirement, plaintiff took no further action with respect to retirement for disability. In explanation of his reason for not doing so, plaintiff testified:
On the 5th of December, when I finally received this report from the medical facility at Fort Sam Houston, I was pushing a deadline of getting it through my corps to the Department of Army in time for retirement. I was a little bit chagrined at the treatment I had received down there, and at the final write-up on it, and I sent it right on through to the Department of the Army, naivety thinking that when it got up here, that when they reviewed my medical records and everything, that they would take corrective action and go ahead and retire me for disability.
24. On December 17, 1962, plaintiff’s report of medical examination of November 15,1962 was endorsed “Physically qualified for separation” by Lt. Col. Harold H. Snyder, MC, for The Surgeon General, Department of the Army.
25. (a) By Special Order Number 19, dated January 25, 1963, plaintiff was retired from active service under 10 U.S.O. § 3911, effective January 31, 1963, after more than 20 years *124 active service, and was placed on bbe AXIS Retired List, effective February 1,1963.
(b) In bis Medical Statement upon Separation, dated January 31,1963, plaintiff stated:
There has been no change in any medical condition since my last final-type medical examination 15 November 1962 with the 'following exception: I continue to 'have trouble with my right ear for which I have an appointment at the ENT Clinic at Brooke Army Medical Center on 8 Feb 63 for a possible operation. My right leg continues to be 5 cm shorter than the left leg.
26. On at least 14 efficiency reports rendered on plaintiff between June 1, 1955, and January 31, 1963, reference was made to the limitations imposed by reason of the disability resulting from the fracture of 'his right femur, stiffening of his right knee, and shortening o'f his right leg, including opinions of the raters that plaintiff could not perform duties required by his grade and branch in time of war. On one report an entry was made that it was necessary to change his duty assignment as a club officer due to aggravation of his injury resulting from the necessity of prolonged standing in such duties.
27. (a) On May 31,1963, four months after his retirement from the Army, plaintiff underwent medical examination at San Antonio, Texas, by the Veterans Administration (VA) for disability evaluation for compensation purposes. Plaintiff then stated that Ms present complaint (symptoms only, not diagnosis) were: Shortening of the right leg with limited flexion of the right knee and chronic otitis of the right ear.
(b) A special ear examination, conducted May 31, 1963, resulted in a diagnosis as follows: Otitis media, recurrent suppurative, right, chronic.
(c) In a report of special surgical examination, conducted May 31,1963, it was noted that on the right side of plaintiff’s face there was a three-inch scar running from the temporal region to just under the lower eye lid; another two-inch scar running from the lateral end of the left eye brow across the other scar 'and just below it; and that the soars were well healed, not tender, slightly depressed, not adherent 'and disfiguring. The diagnosis in the report of surgical examination were:
*125 (1) Left inguinal 'bernia history of surgically corrected.
(2) Scar, scalp, occipital region, residual of laceration.
(3) Abrasion of lumbar region from the records.
(4) Soar, right side of face, residual of shell fragment wound, disfiguring.
(d) A special genito-urinary examination, conducted May 31, 1963, resulted in the following diagnoses:
(1) Stricture of posterior urethra probably due to pros-tatic 'hypertrophy.
(2) No disease found in the anterior urethra.
(3) Verrucose acuminata of the 'anterior urethra apparently healed.
It was recommended that plaintiff should have cystoscopy and urethrascopy to determine the cause of urethral stricture.
(e) A report of a special orthopedic examination, conducted May 31,1963, stated in pertinent part:
P. E.: 5'8", 169 pounds, 40 years of age. Eight lower extremity — there is a 10" operative scar over the lateral aspect of the right thigh, and a 5" operative scar over the anterior half of the right iliac crest. They are both non tender, non depressed and non adherent. There are also small sears on the medial and lateral aspects of the upper end of the right tibia (where the skeletal traction was applied). The calves and thighs are of equal circumference. The right lower extremity is 2" short. This shortening occurs in the right femur. The deep' reflexes of the lower extremities are normal. The right quadriceps has normal power. The right knee presents rather marked limitation of flexion. Motion at the right knee is 0 degrees to 90 degrees. The fight knee presents slight AP relaxation, as compared to the left knee. The right knee presents no swelling or effusion today. There is no lateral relaxation. There is slight crepitus upon motion. There is no definite tenderness. Motions are full and free in 'all directions at the right hip. Without his shoes, veteran bears most of his weight on his left lower extremity and stands on tip toe on the right. If he stands on the sole of his right foot, he then has a rather marked right dorso-lumbar postural scoliosis. The spine is straight upon lying. The right femur is clinically solid. Veteran is able to raise his right lower extremity from ■the examining table with his right knee fully extended. He is not able to squat, due to the rather marked limita *126 tion of flexion of bis right knee. He walks with a fairly marked right limp.
Diagnosis: Comminuted 'fracture of upper % of right femur, post operative, with residual 2" shortening of right lower extremity, limitation of flexion of light knee, and slight AP relaxation of right knee (due to injury to right anterior cruciate ligament).
(f) The diagnoses of plaintiff’s condition as a result of the VA examination of May 31, 1963 were:
1. Normal eyes.
2. Otitis media, recurrent suppurative, right, chronic.
3. Left inguinal hernia history of surgically corrected.
4. Soar, scalp, occipital region, residual o'f laceration.
5. Abrasion of lumbar region from the records.
28. (a) By Bating Decision dated July 12, 1963, the Veterans Administration awarded plaintiff a combined disability rating of 40 percent from February 1, 1963, the day following his retirement from the Army for years of service.
(b) Plaintiff’s disabilities, service connected, were listed and rated, each from February 1,1963, as follows:
(1) Fracture, right femur, postoperative, with shortening of extremity and knee disability, 30 percent, VADO 5255.
(2) Scars, right side of face and scalp, residual shell fragment wounds, 10 percent, VADC 7800.
(3) Stricture, posterior urethra due to prostatic hypertrophy, 10 percent, VADC 7527.
(4) Abrasions, lumbar region, 0 percent, VADC 7805.
(5) Otitis media, right, chronic, 0 percent, VADC 6200.
(6) Hernia, left inguinal, postoperative, 0 percent, VADC 7338.
(7) Verrucose accuminata, anterior urethra, healed, 0 percent, VADC 7599.
(8) Sinusitis, right antrum, 0 percent.
(c) Service connection was denied for deviation of nasal septum, eye pathology, and hemorrhoids.
(d) Plaintiff was advised of the combined 40 percent rating on July 19,1963.
29. By application dated October 2, 1963, plaintiff requested the Army Board for Correction of Military Records (ABCMB) to change his retirement to show that he was disabled at the time of his release from active service. The *127 official form -used provided for a “yes” or “no” response to the printed request that the applicant desired to appear before the Board at Washington, D.C., at no expense to the Government. Plaintiff checked the negative answer. Plaintiff was not represented by counsel. The official form also set forth the following printed instruction:
Personal appearance of you and your witnesses at hearing or representation by counsel is not required to insure full and impartial consideration of applications which qualify for hearing. Such appearances and representations are permitted, at no expense to the Government when a hearing is authorized.
In a supporting statement, plaintiff recounted his request of October 1962 that he appear before a Physical Evaluation Board for disability retirement, complained that he had 'been deprived of that right, and stated his reasons why he believed he had not received a fair and just final examination by the Army. He further stated that he felt he was justly examined by the Veterans Administration; that he did not believe a finding by the Correction Board would increase his disability rating more than that determined by the VA; and that his reason for the appeal to the Board was to have his records reveal that he was in fact disabled at the time of his retirement and eligible for a part of his retirement pay to be computed as disability pay with a resultant decrease in taxes, plus any other benefits that might accrue to him.
30. By form letter dated October 28, 1963, the ABCMR requested the VA Regional Office, San Antonio, Texas, to furnish to the ABCMR plaintiff’s Army and VA clinical and medical records, and physical examinations, with a statement of compensation, diagnosis, code number and percentage of disability. A VA form in evidence, dated November 8, 1963, indicates that there was a transfer of records of plaintiff from the VA Regional Office, San Antonio, Texas, to the ABCMR. In the “Remarks” box of the transfer form, it was stated:
No statement of compensation furnished. Vet did not waive in favor of comp. Disability rateable 40% from 2-1-63.
31. By Disposition Form, dated November 15,1963, without notice to plaintiff, the ABCMR referred plaintiff’s ap *128 plication for correction of records, Ms AG 201 file, Ms service and medical records, and Ms efficiency file to tlie Physical Standards Division of the Office of The Surgeon General, Department of the Army, and requested that plaintiffs application together with the military and medical records be reviewed and a comprehensive opinion furnished to the ABOME for guidance of the ABOME regarding the medical issues raised by the applicant. The request form also stated:
8. It is also requested that, if appropriate, your opinion be expressed regarding the advisability of having the applicant appear before a medical or physical evaluation board for determination of the issues involved. In addition to the foregoing, such other comment, as may be appropriate and helpful in the adjudication of the case, is requested.
32. (a) On November 19,1963, Lt. Col. Harold H. Snyder, Physical Standards Division, SGO, the same officer mentioned in finding 24, furnished the ABCME with the following advisory opinion concerning plaintiff’s application for correction of records:
1. Eecords in the case of the above-named individual have been carefully reviewed in this office and in the offices of the appropriate consultants to The Surgeon General.
2. Eeview of the record shows that this applicant had a long history of a chronic ear infection requiring treatment on numerous occasions since 1944. Plowever, in the latter years of his active service there were fewer episodes requiring treatment. There is also noted in 1952 the history of fractured femur with residuals of slight limitation of knee flexion and shortening. The shortening is measured on various examination as from 1 inch to 2 inches or 5 cm. As described the severity of the otitis media and the limitation of motion, shortening or other residuals of the fractured femur as shown in the records were not so severe as to warrant a finding of physical unfitness.
3. It may be pointed out that the Career Compensation Act of 1949 provides physical disability retirement for individuals who are determined to be physically unfit to perform duties of their rank, grade or rating and who otherwise qualify under the Act. The law also prescribes that the disabilities which would entitle a member to such retirement must be ratable under the VA Schedule *129 for Eating Disabilities. Determination, of fitness to perform active duty is based on the individual’s physical or medical capacity to serve in the military service and not on whether he has a ratable defect under the VA Schedule. The governing determination of fitness is that made at the time of separation.
4. The opinion is expressed that the applicant’s claim of error or injustice in the medical aspect of his separation from the military service is not substantiated by the recorded medical evidence and he had no physical or mental impairment of such a nature or degree of severity which would have warranted his retirement for disability under the rules, laws, regulations and policies in effect at that time.
(b) Plaintiff’s application was denied by the ABCME without a hearing on December 4,1963, and without any advice to plaintiff of the rendering of the foregoing advisory opinion.
(c) By letter dated December 1Y, 1963, The Adjutant General advised plaintiff that after examining and considering his Army records and the facts presented by him, the ABCME determined on December 4, 1963, that insufficient evidence had been presented to indicate probable error or injustice; that accordingly, his application was denied; and that in the absence of new and material evidence, further consideration by the Board was not contemplated.
33. (a) Plaintiff was hospitalized at Brooke General Hospital, Fort Sam Houston, Texas, from January 3, 1964, to March 2,1964.
(b) He was admitted with the chief complaint of right frontotemporal headache of 12 hours duration. In the morning of the admission date, while at work, he had developed a severe headache on the right side, followed rapidly by an episode of syncope in which he fell from his chair to the floor and remained in a comatose state on the floor for approximately 10 minutes. He awoke with a right frontotemporal headache of severe variety, and felt drowsy. He had difficulty swallowing and became nauseated. He was admitted to the Neurological Service, Brooke General Hospital, and evaluated for possible aneurysm. He rapidly became asymptomatic at that time, and it was then felt that the etiology of the headache was not on the basis of organic disease. Plain *130 tiff then advised that in October 1961 while watching television he noticed decreased vision in his left eye of a transient variety.
(c) In the physical examination on admission, it was noted that plaintiff was lying quietly with his eyes closed because of severe headache; that there appeared to be a slight facial weakness on the left noted as symmetrical smile; and that there was pain in the right frontotemporal area of increased variety on motion of the head. Plaintiff was found to be oriented in three spheres and cooperative. His pupils were equal, even, round and reacted to light and accommodation. Full extraocular movements were accomplished without nystagmus. Funduscopic examination was unremarkable. There were no ocular bruits. Plaintiff’s speech was clear and appropriate. Carotid pulsations were normal without bruit. Examination of extremities revealed the deep tendon reflexes to be normal bilaterally. There was good strength. Test of cerebellar function was within normal limits. There were no pathological reflexes.
(d) Shortly after admission, a lumbar puncture was performed on plaintiff. The cerebrospinal fluid was noted to be grossly bloody and did not clear through five tubes.
(e) Plaintiff was watched closely on the night of admission, and at 4 a.m. on January 4, 1964, it was noted that he was unarousable. His vital signs remained unchanged except that his temperature was 100 degrees. His headache continued. He could not raise his eyes above 15 degrees over the horizontal. Recent memory was impaired. The 7th cranial nerve weakness was less apparent than on admission.
(f) At 8:30 a.m. on January 4, 1964, plaintiff was seen in neurosurgical consultation by Lt. Col. Anthony L. Brittis. Dr. Brittis reported plaintiff was “sort of lethargic” and complaining of right frontal headache; that his memory span appeared to be short; that extraocular motion study revealed plaintiff was unable to look up, limited to slight and very transient upward gaze at best; that there was no gross evidence of facial weakness; and that there was neck stiffness of slight degree. Dr. Brittis’ recorded impression was: Subarachnoid hemorrhage secondary to aneurysm. Pie planned angiography.
*131 (g) By January 5, 1964, plaintiff’s headaches had cleared. He was still slightly disoriented. Neurological examination remained the same.
(h) On January 6, 1964, a right brachial arteriogram was performed on plaintiff. A berry aneurysm was seen on the right anterior cerebral artery and the right side of the anterior communicating artery. Following this procedure plaintiff developed a mild bradycardia which resolved fairly rapidly on small increments of atropine.
(i) On January 6 and 7, 1964, preoperative arteriograms were performed on plaintiff for the right and left carotid arteries. They revealed an aneurysm approximately % to 1 cm in diameter at the junction of the right anterior cerebral and the anterior communicating arteries. The aneurysm was well visualized. It did not appear to have a stalk. It seemed to be filling from both the left and right side. There appeared to be vessels entering and leaving the aneurysm.
(j) A radiographic report dated January 9,1964, pertaining to the January 6, 1964, right angiogram (arteriogram) stated:
Bight angiogram 6 Jan 64.
Multiple injections in AP, lateral, and oblique positions demonstrate the right carotid and vertebral circulations satisfactorily. There is demonstrated a 3x5 mm aneurysm in the region of the anterior cerebral artery, the point of origin of which cannot be definitely identified ’but is felt to most likely arise and perhaps completely involve the anterior communicating artery. The anterior cerebral artery and its branches distal to the lesion are somewhat tortuous and coarse but otherwise appear normal, as do the remainder of the intracranial vessels demonstrated.
(k) A radiographic report dated January 9,1964, pertaining to the January 7,1964, left carotid angiography (arteri-ogram) stated:
Left carotid angiography 7 Jan 64.
Left carotid injection was performed in routine manner and the second time with pressure over the right carotid vessel. No definite abnormalities are noted in the internal carotid artery on the left or the major intra-cranial branches. Excellent cross filling of the right in-tracranial vessels are demonstrated in the view employ *132 ing right carotid pressure. This again demonstrates the aneurysm on the right.
(1) On January 9, 1964, an operation was performed by Lt. Col. Brittis on plaintiff for surgical treatment of his aneurysm, described in the Operation Report of plaintiff’s hospital record, as follows:

Operation Performed

1. 4731-759 — Exposure of left internal carotid artery in the neck and application of Selverstone clamp.
2. 211-13 — Craniotomy, right fronto-temporal, with clipping of A-l segment of right anterior cerebral artery and partial wrapping of aneurysm with fine mesh gauze and surgicel.
3. 9331-12 — Lobectomy, right frontal tip.
The patient was placed under general anesthesia and then put under hypothermia with 28 degrees centigrade as the final level. When the patient’s temperature reached 31 degrees centigrade he was prepared for exposure of the left internal carotid artery in the neck. The patient was placed in the supine position on the operating table with the head placed on the head rest. The operative area in the neck as well as over the scalp was prepped with phisohex and betaldine.
A transverse incision was made in the neck at the level of the thyroid cartilage. The incision was carried through the subcutaneous and platysma layers. Bleeding was very slight. Next the deep fascia medial to the sternocleido-mastoid was opened. Then by sharp and blunt dissection the carotid sheath was reached and opened. We found ourselves at the level of the bifurcation. The left internal carotid artery was identified and isolated. The vagus nerve was seen and kept out of the operative field. Next a Selverstone clamp was applied about the left internal carotid artery. The screw shaft was screwed to the Sel-verstone clamp and the Selverstone clamp was kept open. Then the operative wound was covered with a sterile dressing. After this was accomplished the scalp was draped in such a manner as to permit a coronal skin incision. Bleeding from the edges of the incision were controlled with Raney clips. Next, a right frontotemporal osteoplastic bone nap was turned. The anterior medial hole was placed exactly at the midline and the posterior medial hole was placed there about the coronal suture level and approximately 1 cm or more off the midline. The edges of the bone were treated with bone wax. The dura appeared slack. A dural flap was turned and this was hinged medially. Two bridging veins were coagu *133 lated ¡and out. Considerable subarachnoid fluid escaped. Also there was some subarachnoid blood which ¡appeared relatively fresh and perhaps was the residual of the patient’s last subarachnoid hemorrhage. The brain was not tight but on the other hand was not completely relaxed. Next the frontal lobe was retracted so as to permit going down the sphenoid ridge. One bridging vein on the lesser wing was sphenoid was electrocoagulated and cut when it started to bleed. The ¡right optic nerve was identified. A hole was made in the chiasmatic cistern and considerable cerebral spinal fluid was released. The cerebral spinal fluid appeared clear. Next the right internal carotid artery was isolated and this was followed to the take off of the right anterior cerebral artery and then the ¡anterior cerebral artery was followed approximately Y§ up its way toward the anterior communicating artery. It was felt 'at this time that it would be better to approach the aneurysm from above through the interhem-ispheric fissure, since it was felt that there would be less likelihood of finding the aneurysm from this point than to trace it further from the sphenoid area. ¡So the inter-hemispheric fissure was opened ¡and this space was followed back. The right olfactory nerve was sacrificed as retraction was made on the right frontal lobe tip. As one proceeded backwards, numerous adhesions were found and there was considerable gliosis of the medial aspect of the frontal lobe bilaterally. The aneurysmal site was finally found after considerable dissection of the arachnoidal ¡adhesions and removed of some of the edematous brain. The aneurysm was located at what would be the site of the ¡anterior communicating ¡artery. This artery was never definitely identified. Approaching from a point just to the left of the midline and then extending to the right of the midline into this, what ■appeared to be aneurysmal mass tied up with the anterior communicating artery, was a large vessel, the identity of which we could not definitely ascertain. It was not easy to determine whether this was the left or the right A-2 segments of the anterior cerebral artery. The difficulty was due to the fact that the left frontal lobe was pulled to the right of the midline by the numerous adhesions. Additional adhesions were removed as well as gliotic brain and the chiasmatic cistern was entered from the tuberculum sella and additional space was obtained by removing additional fluid from the chiasmatic cistern. It was felt at this time that it would be easier now to find the aneurysm by tracing the anterior cerebral ■artery from the sphenoid area. As this was being done, *134 brisk bleeding started from the 'aneurysmal site. Bleeding appeared to ensue from the dome of the aneurysm. Immediately blood transfusion was started at a rapid pace. At this point the right internal carotid artery was temporarily clipped with a Mayfield clamp. Bleeding was still very brisk. A Mayfield clamp was placed on the right anterior cerebral artery but subsequently it was found that this could not stay on the artery. Bleeding still was profuse so the left internal carotid artery was clamped in the neck with a Selverstone clamp. The total time of clamping of the left internal carotid artery was 21 minutes. This time also included occlusion of the right internal carotid 'artery or the right anterior cerebral artery. As soon as the artery had been clipped, the right frontal tip was amputated. The aneurysmal site was then approached via the interhemispheric fissure and the bleeding point was easily found and controlled with cot-tonoids. Now it was seen that the aneurysm was much more extensive than indicated by angiography. The aneurysm seemed to extend right into the sella turcica and also laterally to the left. The left optic nerve was stretched over what appeared to be aneurysm and it was flattened like a ribbon. The 'aneurysm in these sites appeared to be thrombosed. The A-l segment of the left anterior cerebral artery was never seen and we were never sure of the A-2 segments of the left anterior cerebral artery. It was not definite but perhaps the left internal carotid artery was seen fleetingly. An attempt was made to place a clip over the hole in the dome of the aneurysm. This seemed to aggravate the bleeding. This bleeding was seen after the left internal carotid artery was released of its clamp in the neck. Next, a winged Olivocrona clip was applied to the A-l segment of the right anterior cerebral artery near its junction with the aneurysmal site. Following this surgicel packing was applied over the bleeding point area. The bleeding stopped again. After waiting for approximately 5 minutes the surgicel packing was removed but bleeding recurred. Therefore the left internal carotid artery was again clamped with a Selverstone clamp in the neck. This was clamped for approximately Y minutes. Then a piece of fine mesh gauze was placed in two layers over the bleeding area and all visible aneurysm and this layer was then covered with surgicel and finally cottonoids were placed over the surgicel to maintain pressure. After Y minutes the clamp in the neck over the left internal carotid artery in the neck was released and the cottonoid packing was removed from the surgicel layer. It should *135 be mentioned that all during this time vital signs remained good. There was a moderate drop in blood pressure for a short period of time during the most active bleeding, but at all times a blood pressure was obtainable. After waiting for some time it was determined that the Olivocrona clip over the right anterior cerebral- artery and the fine mesh gauze and surgicel packing over the aneurysmal surface superiorly and anteriorly and posteriorly as much as possible were effective in controlling bleeding from the aneurysm. Therefore it was decided to close the operative wound. Before closure some bleeding points from the right frontal lobe were electro-coagulated. It was felt that we had obtained sufficient space with the right frontal tip lobectomy to take care of any swelling the patient might have postoperatively. The operative hole was thoroughly washed out with saline and saline was left in the operative wound. The dura was closed completely except for a small area from which a %" Penrose drain exited. The drain was placed deep in the operative wound and made to exit through a separate skin incision. Multiple peripheral tack ups and a central tack up were used to prevent epidural hematoma. The bone flap was anchored in place with multiple 3-0 silk sutures. The temporalis fascia was closed with interrupted 3-0 silk suture and the skin was closed with thru and thru wire sutures. Next, the Selverstone clamp was removed from the internal carotid artery in the left side of the neck and deep layers were approximated with 3-0 catgut and the neck incision was closed with 4-0 silk. Blood loss during the operative procedure the major part of which occurred during the active bleeding was approximately 6-7 pints. The patient was given 7 pints of blood. Also during the surgical procedure he received 1100 cc of intravenous fluids. Approximately one hour before the termination of surgery patient was given 100 mgm of solucortef intravenously. Earlier in the day he had received intravenous Decadron and even earlier in the day had received Decadron intramuscularly as well as the day before surgery. The patient resumed his own breathing while the scalp was being closed. He was taken to the recovery ward in good condition.
(m) By January 10,1964, plaintiff was speaking but somewhat incoherently. He cooperated when asked to do certain things. He was somewhat confused for the first week post-operatively. However, at times he did answer coherently. The left pupil was somewhat smaller than the right. By January 14,1964, the pupils were medium to small, equal and *136 reacting ¡to light. Plaintiff was moving all extremities well and taking oral feedings well. By Jannary 16, 1964, he was sitting up in bed and completely 'oriented, taking a soft diet without problems. The vital signs were stable. There was noted to be a partial 6th nerve palsy on the left. Plaintiff progressed fairly rapidly toward the clearing of sensorium. On January 24, 1964, and lasting through January 30,1964, plaintiff underwent a phenomena of duplication of parts of the body. He maintained on one occasion that he had two heads and on another that he had three legs. This was felt to be delusional occurrence of a transient nature occasionally seen in recovering neurosurgical patients. By February 2, 1964, these delusions were not present and did not recur. On several occasions between February 18-21,1964, he had transient episodes of diplopia which cleared after a short while. It was reported that throughout February 1964, plaintiff “made a steady and complete neurological recovery.”
(n) In Doctor’s Progress Notes, it was stated on January 16, 1964, that plaintiff was able to see out of both eyes but complained of some blurriness; on January 17 and 21, 1964, that the 6th cranial nerve palsy on the left was persisting; on January 22, 1964, that the palsy was not as pronounced ; and on January 24,1964, that the palsy was not as obvious as before but still present along with previously noted diplopia.
(o) An ophthahnologic consultation report on February 12, 1964, noted an increase in the size of the left blind spot.
(p) On January 24, 1964, a postoperative electroencephalogram (EEG) was performed on plaintiff. The EEG consultation report stated:
The basic frequency is 6-7 cps generalized slowing. There is a slow wave focus in the right frontal lead with occasional bifrontal slowing. At times, there is some left temporo-Sylvian sharp wave focus.
Group: Abnormal
Focus: Yes
Is repeat advised: At clinician’s discretion — in 3 to 4 weeks
Impression: Abnormal slow record with right frontal slowing.
*137 (q) On February 24,1984, plaintiff underwent postoperative angiography (arteriograms of the right internal carotid artery and left common carotid artery). The aneurysm was visualized on the arteriograms. The aneurysm at this time was noted as somewhat smaller. A Doctor’s Progress Note on February 24,1964, indicated that the preoperative diagnosis was an aneurysm of the anterior communicating artery and that the postoperative diagnosis was the same. In the narrative summary in the hospital record, the aneurysm found on February 24,1964, was reported as being approximately the size indicated in the preoperative angiogram.
On March 2, 1964, a radiographic report pertaining to the February 24, 1964, cerebral arteriogram stated:
Cerebral arteriogram 24 Feb 64.
Eight and left carotid injection was performed. The right injection demonstrates the internal carotid and its major intracranial branches. The vessels are entirely normal in appearance. Appreciated is a metallic clip which is seen to completely occlude the anterior aspect of the right anterior cerebral artery. No contrast material was seen beyond this point coursing up the anterior cerebral and no definite aneurysmal dilatation is identified. The middle cerebral group is normal in appearance.
Following this contract material was injected into the left carotid artery, again outlining this vessel and its major branches well. This demonstrates the anterior cerebral arteries to be midline in course, as seen on the AP projection. Appreciated is cross filling of the previously studied aneurysm of the anterior communicating artery. At this time this structure is approximately one half the size as was previously visualized. The remaining middle cerebral branches are entirely normal in course and caliber.
As of April 6,1964, L/t. Col. Brittis, the operative surgeon, made a correction to the narrative summary in the hospital record, which addendum stated:

Addendum and Correction to the Above Narrative Summary:

Postoperative right carotid angiogram showed a clip in the region of the right anterior cerebral artery but the aneurysm which had been seen on preoperative right carotid angiography was no longer evident.
Postoperative left common carotid angiography showed the aneurysm, but the size of the aneurysm was *138 smaller by 1/s to i/2 that seen on preoperative angiog-raphy (it should be noted that at preoperative left carotid angiogram the aneurysm was not seen except with simultaneous contralateral right carotid compression).
(r) Plaintiff underwent postoperative psychometric studies which revealed moderate depression but no significant impairment of intelligence.
(s) On March 1,1964, a spinal puncture was performed on plaintiff. It was reported that gross red blood cells were present, but that the specimen was unsatisf actory.
(t) Plaintiff’s diagnosis on discharge from Brooke General Hospital on March 2,1964, was:
Aneurysm, junctional anterior communicating artery and right anterior cerebral artery. Cured 9 Jan 64. (Due to unknown cause.)
At the time of his discharge from the hospital, plaintiff was placed on prescription of 100 mgm of dilantin three times a day.
34. (a) On April 6,1964, plaintiff was examined on an outpatient basis by Lt. Col. Brittis in the Neurosurgery Clinic, Brooke General Hospital. Dr. Brittis recorded that plaintiff stated he was doing very well and had returned to work; that plaintiff was continuing to take 100 mgm of dilantin three times a day; and that his only difficulty was persistent hypersensitivity in the right foot especially on the bottom of the foot. Dr. Brittis stated that plaintiff looked perfectly well, that the right bicep jerk was more active than the left, but deep tendon reflexes were otherwise physiologic. He also stated that there was obvious hypersensitivity on the plantar aspect of the right foot. Pie noted that plaintiff was to be rechecked in three months. He also made notes concerning correction of the hospital narrative summary, accomplished as described in finding 33 (q).
(b) On July 6, 1964, plaintiff was examined by Lt. Col Allen F. Kingman, Jr., who 'had assisted Dr. Brittis in the aneurysm operation. Dr. Kingman recorded that plaintiff was doing well and was asymptomatic except for difficulty with near vision, particularly at the end of the day. It was stated that plaintiff’s wife believed that plaintiff had some squint at the end of the day. It was stated that plaintiff *139 was neurologically normal, except that lie had residuals from the old injury of his right lower extremity, and that he no longer had any particular pain in his right leg, which had been a problem for so long. Plaintiff was furnished a prescription for dilantin, 100 mgm, three times a day, with two refills. He was to be seen again in three months.
(c) On October 12, 1984, plaintiff was again seen at the Neurosurgery Clinic, Brooke General Hospital. It was recorded that he was asymptomatic and that he had had no seizures. He was to return December 4,1964.
35. At 5:30 p.m., November 24,1964, plaintiff was brought to the emergency room of Brooke General Hospital. An hour before he had suddenly lost consciousness for a brief but unknown period of time. An observer reported to plaintiff’s wife by telephone that plaintiff had had a “convulsion” with “chewing motion and deep ’breathing.” Plaintiff was amnesic as to the episode. He was slightly “groggy” but became alert, and was without complaint. The examining physician noted his impression that plaintiff had probably had a seizure. He also noted that he discussed plaintiff’s case with Lt. Col. Bullock who felt that plaintiff had had a seizure but that admission for observation was not necessary in view of plaintiff’s symptoms and the findings made. It was suggested to plaintiff that he report to the Neurosurgery Clinic that evening or the next morning.
36. On November 25,1964, plaintiff reported to the Neurosurgery Clinic, when the examining physician requested an emergency electroencephalogram be performed, stating as his reason that plaintiff had a postoperative anterior cerebral— anterior communicating saccular aneurysm, that plaintiff had had a major cerebral seizure on November 24, 1964, and that plaintiff was on dilantin, but without barbiturates. The consultation report of the EEG examination performed November 25,1964, stated:
The basic frequency is 8-9 cps — the alpha is fairly well. developed. There is much 5-7 cps symmetrical slowing. In addition, there is a fairly consistent right fronto-Sylvian 3-5 cps moderate voltage slowing which is augmented on hyperventilation. As a whole, this does not have the appearance of a postictal record.
Group: Abnormal
*140 Focus: Yes
Is repeat advised: Yes
Impression: Abnormal, right frontal focally slow record. Repeat in two weeks.
Thereafter plaintiff was prescribed and took phenobarbital two times a day as well as dilantin three times a day.
37. On May 27, 1964, between the time of surgical treatment for his aneurysm and the date of his cerebral seizure, the VA rendered a supplemental rating decision which determined service-connection for plaintiff’s aneurysm condition. The rating decision stated:
* % * * ❖
F. Original claim is in pending status. Service records reflect that in June 1961 veteran complained of severe headaches after heavy work. In July 1961 a traumatic spinal tap was done and this relieved the headaches. BBC’s without crenation were noted in the fluid. Cerebral aneurysm was suspected but not proven. Cited discharge summary from Brooke General Hospital reflects that veteran was hospitalized as a retired officer with chief complaint of right frontal-temple headaches of 12 hours duration. Angiogram showed a 3x5 mm. aneurysm in the region of the right anterior cerebral artery. On January 9, 1964, a right frontal temporal craniotomy was performed with tipping of the A-l segment of the right anterior cerebral artery and partial wrapping of the berry aneurysm. Post Operative psychometric studies revealed moderate depression but no significant impairment in intelligence. The report also states that cause of aneurysm is unknown.
D. In view of the long period of service, and treatment in service it must be held that the hemorrhage in 1961 resulted in a permanent increase in severity of what is apparently a congenital condition. It is apparent that current findings verify the aneurysm which was suspected in 1961.
$ $
This rating decision restated the disabilities and ratings set forth in the rating decision of July 12, 1963, as related in finding 28(b), and in addition listed the following disability and ratings thereon:
*141 Aneurysm, junctional anterior communicating artery and right anterior cerebral artery with craniotomy and lobectomy, right front tip, 0 percent from February 1, 1963, 100 percent from January 3, 1964, and 10 percent from September 2, 1964, VADO 7111-8009.
On the basis of the latter and the previous disability ratings, plaintiff was awarded a combined rating of 40 percent from February 1, 1963, 100 percent from January 3, 1964, and 50 percent from September 2,1964.
38. (a) On September 2,1964, plaintiff underwent physical examination at the VA Regional Office, San Antonio, Texas. The scheduling notice, dated May 27, 1964, directed attention to plaintiff’s various disabilities, and requested X-ray examination of his skull and determination of the extent of skull defect. The examination occurred several weeks prior to the major seizure experienced by plaintiff on November 24,1964.
(b) Plaintiff then advised that since his employment by Acme Brick Company, San Antonio, Texas, on June 13,1963, he had lost nine weeks of work due to hospitalization. His complaints were headaches, dizziness, and forgetfulness. He stated that since his aneurysm operation he had had to commence to use glasses to read and work. He stated that his right foot had hurt ever since the operation.
(c) A psychiatric and neurological examination reported that plaintiff possessed good personality structure and showed no symptoms of mental disease, and that organic findings were minimal neurologically, and that while plaintiff had recent craniotomy for congenital aneurysm of cerebral vessels, he had obtained good results and no handicap. The diagnosis recorded was: (1) No mental disease found. (2) Aneurysm, juncture of anterior communicating and right anterior cerebral arteries, craniotomy for (Jan. 1964) residuals, mild.
(d) A special ear examination was conducted, with the following diagnosis reported: (1) Otitis media, non-suppura-tive, right chronic. (2) Defective hearing, conductive right. The examining physician stated that the right ear drum was thickened, with healed performation, and that there was no discharge, but some loss of hearing in the right ear.
(e) A special genito-urinary examination reported that *142 plaintiff bad marked difficulty in starting a stream, dribbling and straining; that the prostate was enlarged, benign in consistency; and that there was a moderately severe urethral stricture. The diagnosis reported was: (1) Mild benign pros-tatic hypertrophy. (2) Urethral stricture, posterior, moderate.
(f) A special orthopedic examination reported that plaintiff complained of aching of right thigh, pain, swelling and stiffness in right knee, and aching of the toes of his right foot. Plaintiff stated that he had a desk job with a brick company, that usually he walked only several blocks, but could walk as far as six blocks without resting, that he found it difficult going up and down stairs, and that he tried to avoid prolonged standing or walking. The examination report stated that the right femur was solidly united; that there was a two-inch shortening of the right lower extremity; that the thighs and calves were of equal circumference; that the deep reflexes of the lower extremity were normal; that circulation in the right foot was normal; that there was a full range of motion in all directions in the right hip; that the right knee presented marked limitation of flexion; that motion at the right knee was 0 to 90 degrees; that there was slight anterior/ posterior relaxation of the right knee; that the right knee did not show swelling, effusion, tenderness, or lateral relaxation; that there was slight crepitus; that without his shoes, plaintiff bore most of his weight on his left lower extremity, standing on tip toe on the right; that if he stands on the soles of both feet, he then has a right dorso-lumbar postural scoliosis; that he was not able to squat normally due to limitation of right knee flexion; and that he walked with a fairly marked right limp. The diagnosis reported was: Com-minuted fracture of upper % of right femur, postoperative, with residual 2" shortening, limitation of flexion of right knee, and slight anterior/posterior relaxation of right knee (due to injury to right anterior cruciate ligament).
(g) A radiographic report stated that plaintiff’s chest, sinuses and right foot were negative on X-ray examination; that as to his right femur and knee, there had been no change since the 1963 examination, and that as to his skull, the following was shown:
*143 Skull: There is a surgical bone flap, measuring 2y2 x 2^", in the left frontal bone and, in addition to the absence of bone at the saw line, there are 4 irregular rounded trephine holes measuring % to % inch. This surgery was performed since the original examination in 1963. There is a single metallic clip lying deep in the mid skull just above the sella turcica.
(lx) On January 25,1965, the YA sent plaintiff a notice of service-connection award for aneurysm, junctional anterior communicating artery and right anterior cerebral artery with craniotomy and lobectomy right frontal tip, with a disability evaluation of 100 percent from January 3, 1964, reduced to 10 percent effective September 2,1964.
39. (a) On April 27,1965, plaintiff filed an amended application with the ABCMR for correction of military records, and therein requested that his records be corrected to show his retirement by reason of disability in lieu of retirement by reason of years of service. Plaintiff was represented by counsel.
(b) Plaintiff checked the appropriate box on the application form, thus indicating that he desired to appear before the Board at Washington, D.C., at no expense to the Government.
(c) Plaintiff stated that he had the following disabilities: (1) Shortening of the right leg by 2 inches, chondromalacia, right knee, osteoporosis of right knee, malunion of femur. (2) Cerebral aneurysm which still exists though attempts to repair it have been made. Plaintiff stated his previous application to the Board was made without reference to the aneurysm because he was unaware of the fact that he was so afflicted.
(d) Plaintiff submitted his complete medical 201 file in support of his application.
(e) On April 30, 1965, plaintiff’s counsel advised the ABÓME in writing that he desired to examine plaintiff’s military records in The Pentagon Building, following notification of availability of records.
(f) In July 1965 the ABOME requested and obtained from the Veterans Administration plaintiff’s clinical and medical records, and a statement, dated July 9, 1965, regarding the ratings and diagnoses awarded to plaintiff by the YA. The *144 Board also requested and obtained the 1961 and 1964 clinical records of the Army hospital, Fort Sill, Oklahoma, and of the Brooke General Hospital, Fort Sam Houston, Texas.
(g) By transmittal letter dated July 15, 1965, plaintiff’s counsel forwarded to the ABCMR a written report, dated May 20,1965, and a supplement thereto, dated June 10,1965, prepared and submitted to plaintiff’s counsel by Dr. Harold Stevens, Ph. D., M.D., a neurologist certified by the Board. The transmittal letter stated that such reports constituted the presentation of new, additional material evidence showing the existence of probable material error and injustice warranting plaintiff being granted a personal hearing on the merits of his application and ultimately the relief sought by him.
(h) Dr. Stevens’ report of May 20,1965, stated:
I am forwarding to you this supplementary report. Reference is made to our prior discussion and my opinion based on the records of Captain Francis G. Brown. I examined him in my office today and learned from him that he is currently asymptomatic, works in the document section of the United States Air Force. The history was reviewed with the patient and is essentially consistent with that in his records. According to the patient, he was well until June 19,1961 when he suffered sudden severe headache “like my head broke,” while pushing a 55 gallon drum of diesel fuel. He did not lose consciousness, drove home, laid down and his wife called a civilian doctor who recommended hospitalization. On the following day, he was examined by a physician at Vance Air Force Base. His headaches persisted and he reported to Fort Sill Army Hospital where a spinal fluid examination disclosed a bloody cerebrospinal fluid. A traumatic tap was inferred and the patient was sent home. However, the following day, his headache was worse which was then attributed to a post-puncture headache. He returned to Fort Sill Hospital where he remained for ten days, was then sent to Fort Brooke Hospital where a repeat spinal fluid examination, ten days after initial onset, was clear.
His headache remained constant for six months and he was required to take aspirins daily, obtained only partial relief.
He then suddenly developed spontaneous blurring of vision in the left eye, and simultaneously the headache disappeared. At no time has he noted ptosis nor double vision. He consulted an ophthalmologist who inferred *145 that there was some old damage to the retina probably by 'burning. This visual defect did not improve.
In January ? 1963, he retired from military service on 20 years service^ at which time he was asymptomatic. He obtained a ]ob as an administrative assistant in a brick company and was well until January 3,1964 when he suffered severe spontaneous headache. He came to on the floor, vomited, isn’t sure whether he had a convulsion. He was taken to Brooke General Hospital where an arteriogram was done.
Reference is made to Dr. Anthony L. Brittis’ note of April 6, 1964 in which he expresses the opinion that the narrative summary dictated by Dr. Feldman was ambiguous regarding the post-operative angiogram. “The summaries will 'be corrected but we will indicate the _ correction here. On postoperative right carotid angiography the aneurysm was no longer seen 'but this aneurysm had been seen on the preoperative angiogram on the right carotid angiography. Preoperatively on the left carotid angiography, the aneurysm had not been seen until contralateral compression was applied to the right common carotid. Postoperatively, the aneurysm was seen on the left common carotid angiography 'but this aneurysm was appreciably smaller than it had been preoperatively. Patient was discharged from the hospital on 100 mgm of dilantin three times a day.”
As noted, it was Dr. Kingman’s opinion as of July 13, 1961 that the patient’s initial headache is considered to be functional rather than organic. He believed that the second headache two days following the lumbar puncture was a post-spinal headache since it was suboceipital associated with some stiffness of the neck and aggravated by the erect position and relieved by lying down. He reiterates the opinion that the tap was traumatic and, consequently, angiographic studies were not indicated. He further states that the first lumbar puncture, done ten days following onset of headache, would have 'been xanthochromic had the patient developed a subarachnoid hemorrhage ten days previously.
At surgery, an anterior communicating saccular aneurysm was found on the right anterior cerebral and the right side of the anterior communicating artery. To facilitate the surgery, a right frontal tip lobectomy was performed and also prior to the craniotomy, the left internal carotid artery was exposed and a clamp applied.
The patient made an excellent recovery but states that he no longer dreams. Other sequelae consist of absent mindedness and reference is made to Dr. Edgar A. Feld- *146 man’s note under course in hospital, “recent memory was impaired. The seventh nerve weakness was less apparent than on admission.” The patient states he also has a fear of being left alone.
About six months after surgery, the patient suffered his first seizure and has been on Dilantin, three times a day, and Phenobarbital, twice a day, since. Eeference is also made to the electroencephalogram performed on November 24,1964, which showed fairly consistent right fronto-Sylvian 3-5/second moderate voltage slowing which is augmented by hyperventilation. The impression was abnormal, right frontal focally slow record.
The patient denies drinking to excess, is permitted one beer a day by his physician.
Eeference is made to the past history of meningitis in 1942, during an epidemic while in the service. He states he suffered no consequence from this.
Neurological examination: disclosed an alert and cooperative man. Blood Pressure: 14%5. Head: there is a healed .transfrontal craniotomy scar. No bruit heard over the calvarium. The carotid arteries are equally palpable. There is a healed angiography scar on the left neck. Downward pressure over the vertex, cough and jugular compression tests are negative and there is free range of motion of the neck in all planes. Station: no Eomberg. Gait: he walks with a limp due to shortening of the right leg. Coordination: no cerebellar signs. Muscle Strength and Tonus: The right knee is limited to 90 degree flexion. The right leg is smaller.
Cranial Nerves: intact. Sensation: there is hypalgesia over the right hip at the proximal part of a healed surgical scar over the lateral thigh on the right. Eeflexes: physiological.
As stated, it is my opinion that Captain Brown suffered a ruptured intracranial aneurysm as described above. It is further my opinion that manifestations of this intracranial aneurysm date back to at least the episode of sudden spontaneous headache on June 19, 1961.
(i) Dr. Stevens’ supplemental report of June 10, 1965, stated:
This is to supplement my prior report to you regarding Captain Francis G. Brown, and also to answer your specific questions posed in your letter of May 26, 1965:
1. The previously ruptured intracranial aneurysm increases the vulnerability of further bleeding and, consequently, arduous physical activity is interdicted.
*147 2. Tension, strain or prolonged physical activity would endanger the physical well-being of the patient.
3. It is difficult to state the precise probability of a recurrence but the probability is considerably higher than if he had not had the initial attack.
4. The prognosis is uncertain, life expectancy is diminished, and I am sure that no insurance company would give him a policy even a rated one.
5. His condition renders him unfit for general military service.
(j) By Disposition Form, dated July 19, 1965, the ABCMR requested the Physical Standards Division of the Office of The Surgeon General to review plaintiff’s application for reconsideration, together with the military and medical records, and furnish a comprehensive opinion for the guidance of the Board regarding the medical issues raised by the plaintiff.
(k) On September 17,1965, the Physical Standards Division, SGO, furnished the ABCMR with the requested advisory opinion, which stated:
1. Records in the case of the above-named individual have again been carefully reviewed in this office, including review by the appropriate consultant to The Surgeon General.
2. After review of the records, the Consultant in Neurosurgery to The Surgeon General is of the opinion that Major Brown’s episode of June 1961 could, in fact, have been a bleeding from his anterior communicating aneurysm. This could have been totally intracerebral in nature with no subarachnoid blood. In consequence, there would have been no xanthochromia noted in the subsequent spinal tap. That this could have been the case is substantiated by the findings at operation of gliosis and adhesions noted in the operative note of Doctor Anthony L. Brittis in 1964 although it might be argued that the findings were a result of the subsequent bleed in 1964. The inference, however, is that these findings were of an older nature than one would have expected from a recent bleed. The visual difficulties experienced by the patient might have been associated with the aneurysm but these were transient and at the time of administrative retirement were not disabling; certainly, at that time the patient exhibited no neurological abnormality.
3. Even if it is accepted that this former member had an intracranial aneurysm at the time of retirement in *148 January 1968, bis disability was potential and not actual inasmuch as there was no neurologic or mental deficit associated with its presence. Doctor Harold Stevens himself states in his note of 20 May 1965 that, after Major Brown retired from the service in January 1963, he was asymptomatic until his bleed one year following. Evaluation of medical fitness for service is based upon the blood vessel involved and upon the residuals remaining after appropriate treatment of the aneurysm. In consequence, at the time of retirement from the service, the fact that the existence of the aneurysm was not known and demonstrated by angiography would not have made a material difference in the finding of medical fitness.
4. While the post-retirement condition is not absolutely germane to the question of medical fitness at the time of retirement, the Consultant in Neurology feels that the comments of Doctor Harold Stevens dated 20 May 1965 and 10 June 1965 in some respects are not exactly correct. Major Brown had his aneurysm partially clipped and then the exterior was reinforced with fine mesh cotton gauze to induce fibrosis thus providing a fibrotic strengthening of the wall of the remaining portion of the aneurysm. This is a known and accepted method of treatment and has been reported as having quite favorable results. Therefore the postoperative demonstration of aneurysmal dilatation does not in itself constitute a present severe threat to life or function. Further, while Doctor Stevens may be correct regarding the insurance company’s attitudes, the Consultant thinks this is not relevant to the present question. The applicant, at present, according to Doctor Stevens’ notes, has no significant neurological deficit or mental deficit.
5. The opinion of The Surgeon General of 19 November 1963 is reaffirmed.
The consultant in neurosurgery referred to in the foregoing advisory opinion was General George J. Hayes who had only recently retired as Chief, Neurosurgery, Walter Heed Army Hospital, but continued to serve as a consultant to The Surgeon General.
(1) By letter dated November 30, 1965, plaintiff’s counsel transmitted to the ABCMR a 38-page brief in support of plaintiff’s application, stating specific and detailed points and authorities as grounds for relief. Plaintiff expressly requested the granting of a hearing before the ABCMR. Plaintiff’s brief quoted in their entireties both of the advisory *149 opinions of the Surgeon General’s Office provided to the ABOME in connection with plaintiff’s original and amended applications for correction of military records.
(m) By letter dated December 13, 1985, the Executive Secretary, ABOME, advised plaintiff’s counsel as follows:
This has reference to the application, dated 24 February 1965, and your supporting brief, dated 30 November 1965, which you have submitted to this office in the case of Major Francis G. Brown, 0 962 620. The application has been accepted and acted upon by the Army Board for Correction of Military Eecords as a request for reconsideration of his original application dated 2 October 1963, to show him retired from the Army on 1 February 1963 by reason of physical disability.
The regulations governing the operation of the Army Board for Correction of Military Eecords provide that it may deny an application without a formal hearing, if insufficient evidence has been presented or if the military records of the individual concerned do not indicate probable material error or injustice.
A review of the records of this office reveals that Maj or Brown’s case was carefully considered 'by the Board on 4 December 1963, on the basis of his original application. It was determined, as a result of such review, that no material evidence of error or injustice was shown to warrant granting a formal hearing of the case and the application was, therefore, denied.
A careful study of Major Brown’s current application and your supporting brief reveals no new material evidence sufficient to warrant reopening of the case. Hence, in the absence of evidence of error or injustice, not previously considered, no further action in the case is contemplated.
40. (a) On November 29, 1966, plaintiff was notified by VA of an increase in the rating for his aneurysm condition to 30 percent effective September 2,1964, and of the VA award of service-connection with a 10 percent rating for his condition of trephine holes, frontal bone of skull, effective January 9, 1964. Plaintiff appealed to the Administrator of Veterans Affairs.
(b) On January 24, 1968, a hearing was held on plaintiff’s appeal before the VA Board of Veterans Appeals, with plaintiff’s representative supplied by the American Legion: Plaintiff contended that in the operative procedure for treat *150 ment of tbe aneurysm, a portion of the right half of the frontal bone, measuring 2% to 2% inches in diameter, was removed, and covered by a surgical bone flap, and that there were three trephine holes each measuring i/2-inch in diameter. It was requested that, in view of the large bone flap and the trephine holes, the Board award a rating of 50 percent under VADC 5296, on the basis that plaintiff’s condition covered merely by a bone flap was much more disabling and dangerous than the same size defect covered by a tantalum plate. It was noted that a lobectomy of the right frontal tip had been performed on plaintiff.
(c) As requested by the Board of Veterans Appeals, the VA Begional Office at San Antonio, Texas, reviewed its rating for plaintiff’s skull defects, separate from his aneurysm condition. It was stated that review and interpretation of the X-ray films of plaintiff’s skull, taken September 2, 1964, showed a triangular surgical bone flap measuring Y cms. in its greatest diameter and Yy2 cms. in its dorso-caudal diameter ; that the bone flap involved the right frontal bone and sphenoid ridge on the right side; that there were four rounded trephine openings, the openings each measuring 1 x 1% cms. in size and involving both the inner and outer tables of the skull; that of the outer two openings, one measured 1 x y2 cms., and the other 1 x 2y2 cms., with the inner and outer tables of the skull alike absent in these areas; and that no changes were revealed in the skull films taken of plaintiff on April 6, 1966. On April 18, 1968, the Begional Office confirmed its rating of 10 percent for the surgical bone flap with the four trephine holes for skull loss from January 9, 1964.
(d) On July 18, 1968, the Board of Veterans Appeals held that plaintiff’s appeal for an increased rating for residuals of cerebral aneurysm was denied, but remanded the case to the San Antonio Begional Office with the instruction that another interpretation of the skull X-ray films be made so that skull loss which involves both the inner and outer tables would be computed in square inches. The Board further instructed that when such had been completed, plaintiff’s claim should be reviewed by the agency of original *151 jurisdiction and processed in accordance with current appellate procedures.
41. (a) On August 1, 1968, the San Antonio Regional Office of YA, having requested another interpretation of the X-rays of plaintiff’s skull, obtained a report which was substantially the same as that described in finding 40(c), except that the measurements were in terms of inches rather than centimeters.
(b) On August 15, 1968, the San Antonio Regional Office issued a YA rating decision which increased the rating previously made for plaintiff’s skull defects. It was stated that the X-ray films revealed skull loss both inner and outer tables larger than two square inches, and that no change in size of the burr holes had occurred. In addition to restatement of the disabilities, ratings and effective dates set forth in the rating decision of July 12,1963 (finding 28(b), suora), and restatement of the rating of May 27,1964, for the aneurysm condition as increased on November 29,1966 (findings 37 and 40(a), supra), the increased evaluation for skull defects was stated:
Trephine holes, frontal bone and surgical bone flap skull, 50 percent from September 9,1964, VADC 5296.
On the basis of the latter and the other disability ratings as amended, plaintiff was then awarded a combined rating of 40 percent from February 1, 1963, 70 percent from January 9, 1964, and 80 percent from September 2,1964.
(c) On September 18, 1968, the VA Regional Office advised the Board of Veterans Appeals that the benefit which was the subject matter of plaintiff’s appeal had been allowed, and that the appeal had been withdrawn.
42. The trial of this case was held on November 13 and 14, 1968, with plaintiff and Dr. Harold Stevens testifying for plaintiff, and Colonel Ludwig George Kempe, Medical Corps, United States Army, testifying for defendant.
43. (a) Dr. Stevens was the Chief of Neurology and Professor and Head of the Department of Neurology at The George Washington University. He 'had served for many years as consultant to the National Institutes of Health, Walter Reed Army Hospital, Bethesda Naval Hospital, the Department of Health of the District of Columbia, and the *152 Veterans Administration. He was Director of the EEG Laboratory of The George Washington University, Children’s Hospital, and the D.G. Department of Health. He was not a surgeon.
(b) In his testimony, he confirmed that he had examined plaintiff on May 20, 1965, and stated the results of his examination substantially the same as they are set forth in his report quoted in full in finding 39(h). He had also reviewed plaintiff’s medical records.
(c) With reference to plaintiff’s aneurysm and its implication, he stated that “an aneurysm is a defect in the wall of the vessel inside the brain, in a very critical position, which makes it vulnerable to rupture and flooding the brain with blood, and in addition deny important part of the brain, nutrition.” He further stated that such an aneurysm is a very dangerous predicament, and rupture of such an aneurysm has resulted in immediate death in 50 percent of the cases without surgery. He described an aneurysm as a saccular extrusion of the wall of the vessel, like a pouch rounded from the vessel wall, contiguous to and continuous with the inside of the artery. He identified the location of plaintiff’s aneurysm as about at the center and at the base of the brain, deep, extending beyond the midline, implicating the optic nerve on the left side, and difficult of access.
(d) In his testimony, Dr. Stevens reviewed at length the report of plaintiff’s aneurysm operation, quoted in full in finding 33 (1). He stated that the reported sacrificing of the right olfactory nerve meant cutting of such nerve; and the result was permanent partial loss of plaintiff’s sense of smell and taste. Dr. Stevens noted that the operating surgeon reached the site of the aneurysm after considerable dissection of arachnoidal adhesions (thickening and scarring of the membrane) and after removal of some of the edematous (swollen) brain tissue, and that the surgeon stated the aneurysm was found at the site of the anterior communicating artery, but that such artery was not definitely identified, nor was a large artery leading into the aneurysm. Dr. Stevens inferred that the surgeon’s vision was hampered by swelling, scarring, distortion of normal 'brain anatomy, and probably considerable bleeding. With respect to the operating sur *153 geon’s note that the left optic nerve was stretched over the aneurysm and was flattened like a ribbon, Dr. Stevens commented that the optic nerve is normally round, that sustained pressure from the bulging aneurysm had flattened plaintiff’s left optic nerve, which would produce impairment of vision in the left eye.
(e) Dr. Stevens stated that plaintiff’s aneurysm was still present, as shown by the postoperative arteriogram of February 24, 1964, described in finding 38 (q). It was his opinion that since the aneurysm was still present, that plaintiff did not have a cured condition, and that the lesion must be quite extensive, pressing on the optic nerve on the left side.
(f) It was Dr. Stevens’ opinion that plaintiff suffered a ruptured intracranial aneurysm and that manifestations of such aneurysm dated back to at least the episode of sudden, spontaneous headache on June 19, 1961. From his review of plaintiff’s medical records, and upon consideration of plaintiff’s history as revealed in such records and as told to him by plaintiff, Dr. Stevens expressed his opinion that plaintiff had his aneurysm in 1961, and that plaintiff then experienced intracranial aneurysm rupture. He stated that the sudden onset of severe headache with nausea while engaging in arduous activity, at a time when plaintiff had been perfectly well, and plaintiff’s recorded condition thereafter in 1961 with respect to persistent headache, blurred vision, abnormal electroencephalogram reading, the finding of blood in his spinal fluid, as well as the documentation of his case after 1961, were facts persuasive for the diagnosis of intracranial aneurysm rupture in 1961. Dr. Stevens stated that scar tissue would have formed as a result of a ruptured aneurysm in 1961, made reference to the operating surgeon’s description of adhesions and gliosis encountered in the 1964 operation, and concluded that such findings were compatible with and validated the other data which permitted the inference that plaintiff had a ruptured aneurysm in 1961.
(g) Dr. Stevens understood correctly that plaintiff was not given an arteriogram examination in 1961, and not thereafter until 1964, and stated that when an intracranial aneurysm was suspected in 1961 as plaintiff’s records reveal, such a test should have been conducted, and if the aneurysm was *154 found, then plaintiff should have been restricted in physical activity, because about 30 to 40 percent of aneurysms rupture with arduous exertion. It was his opinion that if an arterio-gram test of plaintiff had been performed in 1961, it would have revealed that he had a ruptured aneurysm.
(h) With respect to the spinal tap test performed on plaintiff on June 29,1961, described in finding 14(c) in the narrative summary of the Army hospital record at Fort Sill, Oklahoma, Dr. Stevens noted that it was recorded that there was blood in both tubes of the spinal fluid extracted from plaintiff. Fie explained that when the needle is inserted into the spine, and when spinal fluid escapes, such fluid is observed for its color and its appearance; that if it is of the traumatic type, which means that the examining physician has inadvertently punctured a small vessel in or near the needle injection site and that blood is derived from some superficial structure and not from the subarachnoid area of the brain, in that event, the spinal fluid begins to clear as the second tube fills. He stated, that that was not the situation in the pertinent spinal tap; that his conclusion was that such tap was not traumatic; and that since the second tube also showed blood, such blood was coming from the subarachnoid area.
(i) With respect to the repeat spinal tap test of plaintiff performed on July 7, 1961, described in the “Hospital Course” part of the narrative summary quoted in full in finding 14(c), Dr. Stevens noted that the record of such spinal tap indicated that the spinal fluid was clear and contained some crenated red blood cells. He stated that such fluid could be clear as of that time, even though plaintiff had experienced subarachnoid bleeding as much as 10 days before that time, because spinal fluid will be clear within 5 days to 3 weeks after subarachnoid bleeding, depending on the amount of bleeding. He explained that crenated red blood cells are old cells, which meant that there had been some subarachnoid bleeding some days before that non-traumatic spinal tap. Crenated cells have concavities on their surfaces, instead of being round and smooth, because membrane permeability has altered, and fluid has left such cells, leaving them withered looking upon microscopic examination.
*155 (j) With respect to the electroencephalogram (EEG) examination of plaintiff, performed July 18,1961, mentioned in find-mo- 15(d), Dr. Stevens obseded that the report of such test showed that there was abnormal waking EEG due to suspicious left frontal slow waves and hyperventilation effect. It was his impression from such report that plaintiff had some intracranial disease process. He stated that the EEG revealed an “abnormal” pattern, which he defined as a deviation from what is considered to be the accepted norm, and he further observed that bifrontal slowing was shown, which is an indication of either increased intracranial pressure or a tumor of some mass, some defective function. He stated that an abnormal EEG is typical with intracranial aneurysms, that one cannot determine or focalize the process by electroencephalogram, but only detect that some pathological process is going on.
(k) With respect to the amputation of the right tip of plaintiff’s frontal lobe, as recorded in the operation report, quoted in full in finding 33(1), Dr. Stevens observed that how much is a “tip” is a matter of interpretation, but that the amputation was from the frontal lobe which is the site of the higher mental functions, including reasoning, thinking, deduction, which could be affected. He stated that a consequence of cutting off a part of the frontal lobe, or even interrupting the integrity of the cortex (superficial mantle) covering the underlying substance of the brain, is epilepsy.
(l) Dr. Stevens observed that plaintiff had had convulsions and had been under treatment with anti-convulsive medication, i.e., dilantin and phenobarbital. He stated that such medication controls, but does not cure the condition, and that plaintiff would have to take such medication for the rest of his life. He explained that as a person grows older with damage to the brain, there is shrinking and scarring, and the person’s threshold of seizures may become lower, and he may have a volley of them, requiring increased medication.
(m) Dr. Stevens stated as his opinion that plaintiff was not fit for military service, giving as his reason that at any moment, with exertion or without, but particularly with exertion, he is likely to have a sudden rupture, with complete loss of consciousness or severe incapacity.
*156 44. (a) Plaintiff testified concerning such matters as Ms injuries sustained in the shrapnel shell explosion in 1944, his partial loss of hearing in his right ear and intermittent right ear difficulties ever since that time, the circumstances of his parachute jump injury in 1958, the persistent discomfort he has had in his lower 'back ever since his leg surgery in 1958, and the habitual pain he has experienced in his right knee and in the old fracture site of his right leg whenever he has had to stand for any prolonged period of time or walk any substantial distance, Ms sudden severe headache on June 19, 1961, his persistent headache for several months thereafter, followed by blurring of vision in his left eye which continued until Ms aneurysm operation in 1964, the sudden explosion he felt in his head when he lost consciousness at his office on January 3, 1964, and was taken to Brooke General Hospital, the lack of any arteriogram examination prior to 1964, and the persistent difficulties he has experienced with his urinary tract before and after Ms retirement.
(b) Following surgical treatment for his fractured right femur in 1953, plaintiff was issued a built-up shoe for Ms right foot to compensate for the difference in the length of Ms legs. It was explained to him that the shoe was not built up to the full extent of the shortage, that settlement of the right hip would take up the difference between the buildup and the shortage in his right leg, and that this would cause some curvature of his spine. Plaintiff has been wearing substantially the same type of shoe for his right foot ever since that time. Such shoe was exhibited in open court.
(c) It was also demonstrated at the trial that plaintiff has limitation in the bending of Ms right knee, and that he is not able to squat with his right knee in normal position.
(d) After the fracture of his right femur, plaintiff was not able to do marching, drilling, prolonged standing or weight bearing. He could not crawl. When he walked as much as six blocks, he would become quite uncomfortable. He experienced difficulty in going up and down stairs.
(e) After his leg injury, plaintiff never again served in an infantry capacity. In 1954 he served as a club officer, but required standing aggravated his right knee and leg condition, and he was relieved of such duty.
*157 (f) At the time of his release from Brooke General Hospital in 1961, following treatment for his severe headache episode, plaintiff was told that the staff did not know what had happened to him, that he was being released to duty, that his situation was similar to that of a heart patient and that he should take life easy and avoid arduous or strenuous activity.
(g)- About three or four months after his retirement on January 31, 1963, plaintiff commenced working as an office clerk in a branch office of the Acme Brick Company, San Antonio, Texas. Except for interruptions for hospitalization, he continued to work for Acme Brick until December 26, 1964, when he was employed by the Air Force as a military personnel clerk until August 22,1966, when he was employed as a Digital Computer Systems Operator (GS-5) with the Department of the Army at Headquarters 4th Army.
(h) When discharged from surgical treatment at the Brooke General Hospital in 1964, it was prescribed that plaintiff take dilantin three times a day, and he was advised that he should avoid arduous physical exercise or work. Plaintiff regularly took the prescribed medication and adhered to the advice.
(i) Following his major seizure in November 1964 and his treatment at Brooke General Hospital, plaintiff was prescribed and ever since that time has taken phenobarbital twice a day and dilantin three times a day.
(j) Since his aneurysm operation in 1964, plaintiff does not sense the experience of dreaming, becomes absent-minded at times, and has a fear of being left alone because of his experiences with explosive headaches and seizures, and having been advised that he is vulnerable to having more of them.
45. (a) Colonel Kempe w'as and had been Chief of Neurosurgery, Walter Need General Hospital, and Consultant in Neurosurgery to The Surgeon General since 1965. Upon graduation from medical school in Switzerland, and after surgical training, he practiced general surgery for twelve years, then was a resident in neurosurgery at Walter Eeed for five years, Chief of Neurosurgery in an overseas hospital, and from 1961 to 1965, Assistant Chief of Neurosurgery at Walter Need. He was an Associate Clinical Professor of *158 Neurosurgery at The George Washington University, Dipló-mate of The American Board of Neurosurgeons, and a member of the American College of Surgeons, Congress of Neurological Surgeons, and the Harvey Cushing Society.
(b) Dr. Kempe was currently performing neurosurgery, and had performed in excess of 250 operations for ruptured intracranial aneurysms. He had not served on any Army board charged with determination of disabilities and ratings for a service member, but had daily served on Army medical boards concerning cases involving neurosurgery. He had not examined plaintiff. He had reviewed plaintiff’s medical records.
(c) Dr. Kempe stated that he was sure that plaintiff had his intracranial aneurysm in 1961, but it was Ms opinion that plaintiff did not have a ruptured intracranial aneurysm prior to January 3,1964.
(d) Dr. Kempe’s opinion was that plaintiff had received, as shown by the report of his operation for intracranial aneurysm, the surgical treatment accepted by every neurosurgeon as a curative procedure, and that plaintiff was surgically cured; that his aneurysm was a single isolated one, and that there was no evidence of any new or second aneurysm ; that because of the surgical method used on plaintiff, the aneurysm could still be seen by postoperative arterio-gram in a slightly smaller dimension than in preoperative arteriogram; that it is “not possible, not probable” for such aneurysm to rupture again; that an aneurysm is not discoverable in an EEG examination, unless it has ruptured; that the primary diagnostic procedure for detecting an intracranial aneurysm is by spinal tap or an arteriogram; that since an-giography (taking of an arteriogram) is a dangerous surgical procedure, it has not been done just to screen out who might or might not have an aneurysm; that the tip of the frontal lobe of plaintiff’s brain was removed, but not the lobe itself; that removal of such tip is an accepted method used by Dr. French of the Mayo Clinic in surgery for an aneurysm located as it was in plaintiff’s case; that reports by Dr. French, who has the greatest experience with the removal of the tip of the frontal lobe because he does it routinely in his surgery for aneurysm similarly located to plaintiff’s, cate *159 gorically state that neither in encephalographic, psychological, or psychiatric testing has Dr. French ever been able to see one single deficit as a result of the removal of such tip.
(e) Dr. Kempe testified that the operation report of plaintiff’s aneurysm surgery showed that the aneurysm was treated neither by being occluded nor ligated, but that the aneurysm was reinforced. He explained that such aneurysm was broad based, as most aneurysms are, but that it involved four vessels leading thereform, all from one complex of multiple bulging, a very bad type of aneurysm, more complicated than the common type. His interpretation of the indication in the operation report that there was partial wrapping of plaintiff’s aneurysm was that with the blood vessels coming out of the aneurysm, there could not be a complete wrapping of such aneurysm, but that the aneurysm was wrapped like the application of a diaper.
(f) Dr. Kempe expressed his opinion that plaintiff was fit for duty and for retention in the service on January 31, 1963. He limited his opinion to plaintiff’s physical condition with respect to an aneurysm, and from a neurological point of view. He further stated that even after his aneurysmal operation in 1964, plaintiff would have been retained on duty status, and after being on limited duty for 12 months, would have been returned to full duty, including overseas and combat duty. Dr. Kempe testified that both in 1963 and thereafter, there were many men in the military service performing full active duty, with no limitations as to type of duty, after having undergone surgery for ruptured intracranial aneurysms, and that even men taking daily medication of dilantin and phenobarbital for control of seizures or epileptic disorders, as was the plaintiff, were performing military duty.
Ultimate Findings and Conclusions
1. The action of the Army Board for Correction of Military Records, denying plaintiff a hearing, was arbitrary, capricious and contrary to the overwhelming weight of the evidence, upon which it must be concluded that in all reason plaintiff should have been granted a hearing, when Physical Evaluation Board proceedings had not been provided, in *160 contrast to the extensive evaluation procedures of the Veterans Administration. Smith v. United States, 168 Ct. Cl. 545, 553 (1964); Farrar v. United States, 173 Ct. Cl. 1008, 1034, 358 F. 2d 965 (1965); Hoppock v. United States, 176 Ct. Cl. 1147, 1167 (1966).
2. The evidence in this case clearly establishes that plaintiff should have been evaluated for disability in Physical Evaluation Board proceedings prior to his retirement for longevity on January 31, 1963; and that had he been so evaluated as contemplated by governing law and regulations, Lawler v. United States, 169 Ct. Cl. 644, 646 (1965), he would have been found unfit for general military service and retired by reason of physical disability with placement on the Temporary Disability Retirement List; and that upon periodic examination pursuant to 10 U.S.C. § 1210(a) (1964), he would have been found permanently disabled for general military service and would have been retired for permanent disability as directed by 10 U.S.C. § 1210(c) (1964).
3. Plaintiff is entitled to disability retired pay computed on a combined rating of 40 percent for the period from January 31, 1963 to January 31, 1965, and on a combined rating of 80 percent from January 31,1965, to the end of the period used for computation of the amount of recovery in further proceedings in this case.
Conclusion or Law
Based upon the foregoing findings of fact and ultimate findings and conclusions, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and that judgment should be entered to that effect, with the amount of recovery to be determined in further proceedings pursuant to Rule 131 (c).

 In Nichols v. Unites States, 158 Ct. Cl. 412, 427 (1962), Array physical profile rating was concisely defined as follows:
“The letters in this rating system represent, ‘3?’ for physique or general physical capacity or stamina, ‘U’ for upper extremities, ‘If for lower extremities, ‘H’ for hearing and ear defects, ‘H’ for eyes, and ‘S’ for neuropsyehiatrlc. The tested individual is graded or rated 1 to 4 after each letter according to his functional ability in that physical category. Number 1 represents above average efficiency with at most a minimal defect; number 2 represents average efficiency with a mild, nonprogressive physical defect; number 3 represents below average efficiency with a moderate physical defect; and number 4 represents nonacceptable efficiency with a marked physical defect.”